ADVOCATES FOR FAITH & FREEDOM
Robert H. Tyler (SBN 179572)
btyler@faith-freedom.com
Julianne Fleischer (SBN 337006)
jfleischer@faith-freedom.com
25026 Las Brisas Road
Murrieta, California 92562
Telephone:    (951) 600.2733

Attorneys for Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| T.S., a minor by and through her father and natural guardian, RYAN STARLING; and K.S., a minor by and through her father and mother and natural guardians, DANIEL SLAVIN and CYNTHIA SLAVIN; <br><br> Plaintiff(s) <br><br> v. <br><br> RIVERSIDE UNIFIED SCHOOL DISTRICT; LEANN IACUONE, Principal of Martin Luther King High School, in her personal and official capacity; and AMANDA CHANN, Assistant Principal and Athletic Director of Martin Luther King High School, in her personal and official capacity; <br><br> Defendant(s) | Case No.: <br><br> **VERIFIED COMPLAINT FOR INJUNTIVE AND DECLARATORY RELIEF AND DAMAGES:** <br><br> 1) **DEPRIVATION OF THE FREEDOM OF SPEECH** <br> 2) **VIOLATION OF THE DUE PROCESS CLAUSE** <br> 3) **VIOLATION OF TITLE IX** <br><br> **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.    Plaintiffs, K.S., a ninth-grade female cross-country athlete, and T.S., an eleventh-grade female cross-country athlete and team captain, at Martin Luther King High School ("MLKHS") in Riverside Unified School District (the "District") contend that the District's policies and practices unfairly restrict their freedom of expression and deny them fair and equal access to athletic opportunities.

2.     This Action arises from the District's failure to comply with Title IX, which guarantees equal athletic opportunities based on biological sex, and the District's censorship of a viewpoint with which it disagrees.

3.     T.S. was ousted from her position on the girls' varsity cross-country team to make room for a biological male transgender athlete who did not consistently attend practices and failed to satisfy many of the team's varsity eligibility qualifications.

4.     As a result, T.S. missed opportunities to compete at a high-profile meet, losing valuable chances for college recruitment and recognition.

5.     The biological male transgender athlete who displaced T.S. on the girls' varsity team had recently transferred from another local high school after breaking that school's all-time cross-country record for the girls' cross-country team.

6.     Following T.S.'s removal from her position on the varsity cross-country team, T.S. and K.S. wore shirts bearing the messages "Save Girls' Sports" and "It's Common Sense. XX ≠ XY." School officials ordered K.S. and T.S. to remove or conceal the shirts, claiming the messages created a "hostile" environment.

7.     School officials claimed the messages on Plaintiffs' shirts created the same level of hostility as a student wearing a swastika in front of Jewish students.

8.     Despite not allowing Plaintiffs' desired messaging on campus, MLKHS allows other political, social, and religious messages to be displayed across campus.

9.     MLKHS's failure to uphold Title IX policies placed female athletes at an unfair disadvantage.

10.    MLKHS's arbitrary and selective enforcement of the dress code violated Plaintiffs' constitutional rights.

11.    This Action seeks to affirm Plaintiffs' right to express their views, ensure fair athletic opportunities for female students, and hold the District accountable for discriminatory policies and practices.

**PARTIES - PLAINTIFFS**

12.     Plaintiff K.S., a minor, is a ninth-grade female[1] student athlete at Martin Luther King High School and, at all times relevant to this Complaint, a resident of Riverside County, California.

13.     Plaintiff T.S., a minor, is an eleventh-grade female student athlete at Martin Luther King High School and, at all times relevant to this Complaint, a resident of Riverside County, California.

14.     Plaintiff RYAN STARLING is T.S.'s father and natural guardian. At all times relevant to this Complaint, Ryan is a resident of Riverside County, California.

15.     Plaintiff DANIEL SLAVIN is K.S.'s father and natural guardian. At all times relevant to this Complaint, Daniel is a resident of Riverside County, California.

16.     Plaintiff CYNTHIA SLAVIN is K.S.'s mother and natural guardian. At all times relevant to this Complaint, Cynthia is a resident of Riverside County, California.

**PARTIES - DEFENDANTS**

17.     Defendant RIVERSIDE UNIFIED SCHOOL DISTRICT is a school district in Riverside County, California. Defendant District is responsible for the adoption and implementation of District policies and ensuring its agents enforce District policies.

18.     Defendant LEANN IACUONE is the Principal of Martin Luther King High School. Under District policy, she is responsible for implementing and enforcing District policies related to student speech and student athletics, and she has discretion in the implementation of said policies on an individualized basis. Defendant Iacuone enforced District policy against K.S. and T.S. when she prohibited K.S. and T.S. from wearing the shirt with the message "Save Girls' Sports" and "It's Common Sense. XX ≠ XY" on it. She is sued in both her individual and official capacity.

---

[1] "Male," "Female, "Boy," and "Girl" used in this Complaint refer solely to binary, biological sex and not a person's "gender identity." *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (Title IX defines "sex" "based on biology and reproductive function."); Black's Law Dictionary (5th ed. 1979) ("**Sex**. The sum of the peculiarities of structure and function that distinguish a male from a female organism[.]"); *see also Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020) ("Sex" in the Civil Rights Act of 1964 "refer[s] only to biological distinctions between male and female").

19.     Defendant AMANDA CHANN is the Assistant Principal and Athletic Director of Martin Luther King High School. Under District policy, she is given discretion to implement and enforce District policies related to student speech and student athletics. Defendant Chann enforced District policy against K.S. and T.S. when she prohibited K.S. and T.S. from wearing the shirt with the message "Save Girls' Sports" and "It's Common Sense. XX ≠ XY" on it. Defendant Chann also made the decision to place the male transgender student athlete on the girls' varsity team and remove T.S. from the girls' varsity team. Defendant Chann is sued in both her individual and official capacity.

20.     All Defendants are responsible for the implementation and application of the District's policies.

## JURISDICTION AND VENUE

21.     This civil rights action raises federal questions under the United States Constitution, specifically the First and Fourteenth Amendments, and under federal law, particularly 42 U.S.C. § 1983 and Title IX.

22.     This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

23.     This Court has authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, implemented through Rule 57 of the Federal Rules of Civil Procedure. This Court is also authorized to grant injunctive relief and damages under 28 U.S.C. § 1343, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

24.     This Court has authority to award costs, attorneys' fees and expert witness fees under 42 U.S.C. § 1988(b) and (c).

25.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

VERIFIED COMPLAINT

**STATEMENT OF FACTS**

**A.    PLAINTIFFS' BACKGROUND**

26.    K.S. and T.S. are fifteen and sixteen years old respectively. Both are currently enrolled at Martin Luther King High School ("MLKHS") in the Riverside Unified School District ("District").

27.    K.S. and T.S. are dedicated and skilled female student athletes at MLKHS.

28.    As a current freshman, K.S. is in her first cross-country season at MLKHS. She is currently on the girls' Junior Varsity Team, consistently ranking between second and third on the Junior Varsity Team.

29.    While attending Frank Augustus Miller Middle School in the District, K.S. participated on the girls' cross-country, track and field, volleyball, basketball, and soccer teams.

30.    While at Frank Augustus Miller Middle School, in both seventh and eighth grade, K.S. was the District champion in cross-country and the District champion across multiple events in track and field.

31.    In seventh grade, her middle school girls' soccer team won district champions, and her girls' volleyball and basketball teams came in second place. In eighth grade, her middle school girls' soccer, volleyball, and basketball teams won district champions.

32.    As a current junior, T.S. is in her third cross-county season at MLKHS.

33.    In 2023, T.S. received the MLKHS Most Improved Award for Cross Country, and in 2024, T.S. received the "Athlete of the Meet" after establishing a new personal record at the 45th Asics Clovis Invitational.

34.    In 2024, T.S. and the MLKHS girls' cross-country team placed second at both the Inland Empire Challenge and at the Big VIII League Finals.

35.    Since August 2024, T.S. has served as the MLKHS girls' cross-country Team Captain. In this leadership role, T.S. is responsible for demonstrating a strong work ethic, upholding a high standard of responsibility, and fostering a positive attitude to inspire and motivate the team.

36.    In August 2024, T.S. earned a position on the girls' Varsity Top 7 on MLKHS's cross-country team.

37.    Since the start of the cross-country season in August 2024, K.S. and T.S. have attended every MLKHS cross-country practice.

38.    Both K.S. and T.S. have dedicated numerous hours each week to cross-country practices and races, all while managing their heavy academic workloads and other scholastic activities. Each week, they participate in practices, diligently training and conditioning to be better athletes.

39.    Both K.S. and T.S. and their families have dedicated significant money, time, and energy to the success of MLKHS girls' cross-country team.

**B.    SCOPE OF TITLE IX**

40.    In 1972, Congress enacted Title IX, 20 U.S.C. § 1681, which forbids education programs or activities receiving federal financial assistance from discriminating against persons based on their sex.

41.    Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

42.    Title IX was designed to eliminate significant "discrimination against women in education." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999).

43.    Title IX and its implementing regulations and guidance require that, if an entity subject to Title IX provides athletic programs or opportunities separated by sex, then it must do so in a manner that "provide[s] equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

44.    Equal athletic opportunity can be determined by whether such athletic opportunities "effectively accommodate the interests and abilities of both sexes." 34 C.F.R. § 106.41(c).

45.    Here, the "governing principle" is that "the athletic interests and abilities of male and female students must be equally effectively accommodated." Policy Interpretation, 44 Fed. Reg. 71,413, 71,414 (1979)

46. More specifically, the District must accommodate the physical abilities of girls "to the extent necessary to provide equal opportunity in . . . levels of competition," and competitive opportunities "which equally reflect their abilities." Policy Interpretation, 44 Fed. Reg. at 71,417-418.

47. As another aspect of equal athletic opportunity, implementing regulations and guidance state that male and female athletes "should receive equivalent treatment, benefits and opportunities." Policy Interpretation, 44 Fed. Reg. at 71,415.

48. The "equal treatment" to which girls are entitled includes equal "opportunities to engage in . . . post-season competition," *id.* at 71,416, equal opportunities for public recognition, 34 C.F.R. § 106.41(c), and the right to be free of any policies which are "discriminatory in . . . effect" or that have the effect of denying "equality of athletic opportunity." 44 Fed. Reg. at 71,417.

49. Accordingly, Title IX is understood to require the allocation of equal opportunities based on biological sex alone without regard to or consideration of gender identity.

## C. MLKHS CROSS-COUNTY STUDENT-ATHLETE QUALIFICATIONS

50. Pursuant to Board Policy 6145.2, Defendants Iacuone and Chann, as District administrators, are responsible for site-level decisions over MLKHS athletic activities.

51. MLKHS provides athletic programs or opportunities separated by sex.

52. MLKHS has four separate cross-country teams, including boys' varsity and junior varsity teams and girls' varsity and junior varsity teams.

53. The MLKHS boys' and girls' cross-country teams are highly competitive in the California Interscholastic Federation ("CIF"), Division 1. The MLKHS boys' cross-county team is ranked 5th in the State of California and the MLKHS girls' cross-country team is ranked 7th CIF Southern Section, Division 1.

54. In order to qualify for the girls' Junior Varsity team, MLKHS student athletes must consistently demonstrate a strong work ethic in practice and a positive effort during meets.

55. According to the 2024 MLKHS Cross Country Team Handbook ("Handbook"), the girls' Varsity Top 7 lineup is typically left to the coaching staff's discretion based on the following criteria: (1) previous race times, (2) practice attendance, (3) "'varsity-level effort' at practice during

the week (or specifically a lack of it), (4) attitude, (5) long-term team strategy by the coaching staff, (6) illness/injury, (7) varsity "exposure," and (8) other unforeseen issues. A true and correct copy of the 2024 MLKHS Cross Country Team Handbook is attached as **Exhibit 1**, p. 7.

56.    The Handbook also states, "Athletes are only allowed one excused missed workout without potential consequences." *Id.*, p. 6.

57.    "Upon the second missed workout, even with prior notification, participation in the next race is by coaches' discretion, but will usually result in missing the race." *Id.*

58.    The Handbook states that "[o]nly a doctor's note specifically mandating 'do not run' will be fully excused with no consequences to Letter Points or racing." *Id.*

59.    According to the Handbook, "[t]he coaching staff will require all juniors and seniors to be fully vested in the cross-country program and 100% of its requirements." *See id.*, p. 3.

60.    Each MLKHS cross-country student athlete and their parent or guardian are required to sign the Handbook, acknowledging its requirements.

61.    The MLKHS girls' cross-country team generally practices Tuesdays and Thursdays from 6:30 A.M. to 7:45 A.M. (Varsity Only), Monday through Friday from 2:10 P.M. to 4:45 P.M. (Varsity and Junior Varsity), and Saturdays from 7:00 A.M. to 9:00 A.M. (Varsity and Junior Varsity).

62.    Given its ranking, the MLKHS girls' Varsity Top 7 is regularly invited to the annual Mt. SAC Cross Country Invitational ("Mt. SAC Invitational"). The Team Sweepstakes Races are reserved for schools with exceptionally strong teams. Typically, schools ranked in the top ten in the State or the top ten in the California Southern Section request to be placed in the Mt. SAC Invitational Team Sweepstakes Race.

63.    The Mt. SAC Invitational is a premier cross-country event in which qualifying teams from around the country participate and compete in. The Mt. SAC Invitational is also the host of the California Interscholastic Federation ("CIF") in Southern California.

64.    This year, the 76th Annual Mt. SAC Invitational was held on October 25, 2024, and October 26, 2024.

65.    The 76th Annual Mt. SAC Invitational was presented by Nike, and a live webcast of the High School division was broadcasted by RunnerSpace+ showcasing the best cross-country runners from around the state and country.

66.    College scouts can attend the Mt. SAC Invitational in person or watch digitally to observe participating high schools and athletes.

67.    College coaches often attend the Mt. SAC Invitational to scout and recruit prospective collegiate athletes.

**D.    IN VIOLATION OF TITLE IX, DEFENDANTS ALLOWED M.L. TO DISPLACE T.S. ON THE GIRLS' VARSITY TOP 7**

68.    The Varsity Top 7 is updated before every meet and the varsity team may change from week to week depending on the qualifications set forth in the Handbook as referenced above. Pursuant to the Handbook, the discretion for determining the Varsity Top 7 is left to the coaching staff. *See* **Exhibit 1, p. 7.**

69.    On or about October 22, 2024, approximately one week before the Mt. SAC Invitational, T.S. and her teammates received the updated girls' Varsity Top 7 list.

70.    T.S., who had held a position on the girls' Varsity Top 7 since August 2024 was removed from the girls' Varsity Top 7 to make room on the girls' Varsity Top 7 for an eleventh-grade transgender student and T.S. was relegated to the junior varsity team for one of the most important meets of the season for college recruitment.

71.    For purposes of this Complaint, the transgender student is referred to as M.L. and is a biological male. [2]

72.    Because M.L. displaced T.S. on the girls' Varsity Top 7, T.S. no longer qualified to compete with the girls' Varsity Top 7 at the October 2024 Mt. SAC Invitational.

---

[2] To protect the identity of the transgender student, alternative initials—M.L.—are used in place of the real name or initials of the student in this Complaint.

73.    M.L. transferred from another Riverside Unified School District high school to MLKHS on or about June 2024.

74.    At M.L.'s previous high school, M.L. ranked #1 on the girl's high school cross-country team.

75.    At M.L.'s previous high school, M.L. broke the previous school's existing girls' all-time cross-country record, a record that had not been broken since 2014.

76.    The MLKHS varsity coach initially identified T.S. on the Varsity Top 7 list for the Mt. SAC Invitational. However, Defendant Chann intervened, modified the list, and place M.L. on the Varsity Top 7 replacing T.S.

77.    As the athletic director and assistant-principal supervising the varsity coach, Defendant Chann exercised the authority provided to her by school district policy and by Defendant Iacuone when she removed T.S. and replaced her with M.L.

78.    Contrary to the varsity eligibility qualifications listed in the Handbook, M.L. did not regularly attend MLKHS cross-country practices.

79.    M.L. attended approximately 13 out of 74 cross-country practices between August 2024 and October 2024.

80.    When M.L. attended practices, of the approximately two and a half hour-practice, M.L. would often only attend the last 50-60 minutes of practice.

81.    When M.L. did attend practice, Defendant Chann would join M.L. for M.L.'s runs.

82.    Oddly, Defendant Chann and M.L. would run together, but separately from the other girls' cross-country team members. Defendant Chann was never designated as a coach or assistant coach. However, Defendant Chann inserted herself into the team by her authority as the athletic director and assistant principal when she began to attend practices with M.L. in October of 2024, something she had not done previous to her replacing T.S. for M.L. on the Varsity Top 7.

83.    On or about October 19, 2024, after not attending any cross-country practices that week, M.L. competed, for the first time, at a varsity-level race with the MLKHS girls' cross-country team. M.L.'s time was 19:41.

84.    T.S. also competed at this same meet. Her time was 20:42.

VERIFIED COMPLAINT

85.    T.S. has attended every cross-country practice this season and has demonstrated a concerted effort to retain a position on the girls' Varsity Top 7.

86.    Plaintiffs were informed by Defendant Chann that a reason for M.L. not attending practices was because M.L. was taking extra classes by taking a 6th period class.

87.    T.S., however, took summer school classes in order to make room in her schedule during the academic year so that she could attend 6th period MLKHS cross-country practices.

88.    M.L's race time, alone, did not qualify M.L. for a position on the girls' Varsity Top 7 according to the Handbook.

89.    As a result of being placed on the Junior Varsity team, T.S. was no longer qualified to participate in the Mt. SAC Invitational as a varsity athlete in the Team Sweepstakes Race.

90.    As a result, T.S. missed opportunities to compete at a high-profile meet, losing valuable chances for college recruitment and recognition.

91.    Because M.L. was placed on the girls' Varsity Top 7, M.L. competed at the Mt. SAC Invitational as a varsity athlete instead of T.S.

92.    K.S.'s high ranking on the girls' Junior Varsity Team places her as one of the immediate contenders for the Varsity Top 7 in the event the girls' Varsity Top 7 is short on athletes due to injury or illness.

93.    Because Defendants did not apply equal standards when considering the girls' Varsity Top 7, Defendants treated M.L. more favorably than K.S., T.S., and the other female athletes who have consistently satisfied many of the varsity eligibility qualifications.

94.    On or about October 24, 2024, prior to the Mt. SAC Invitational, T.S. and her parents met with Defendant Chann, Defendant Iacuone, and the cross-country head coach regarding M.L.'s displacement of T.S. from the girls' Varsity Top 7.

95.    T.S.'s parents addressed the expectations listed in the Handbook. T.S.'s parents referenced the mandatory practice attendance and the varsity attitude requirements to place on the Varsity Top 7 position.

96.     Immediately following this meeting, on the same day, T.S.'s mother filed a Title IX complaint with the District citing gender discrimination. A true and correct copy of this Title IX complaint is attached as **Exhibit 2**.

97.     In her complaint, T.S.'s mother told the District she believed T.S. was being discriminated against based on her choice of gender for a few reasons:

a.     She [T.S.] was told she MUST be in the 6th-period class, even though she does not need PE credits and had to take summer school in order to keep room in her schedule. The other athlete [M.L.] has not been required to be in the 6th-period class.

b.     My daughter [T.S.] attends ALL practices, even when injured, and stays until 4:30-4:45 every day. The other athlete [M.L.] is not required to attend 6th-period nor the time allotted after school for practice. This person [M.L.] gets to go home instead of coming to the part of practice they are free to attend outside of academic hours.

c.     This person [M.L.] has chosen to try and graduate a year early. We think that is a great accomplishment and a worthwhile goal to pursue; however, there are many instances of cisgender girls giving up their sport or missing out on competition (games/races) because they are not allotted the same rules as this transgender person, specifically not being mandated to attend practices. Cisgender girls would be required to attend as much of practice as they can or they would be excluded from competition, why is the standard being applied differently? King Administration has notified us that this person is making a CHOICE to graduate early, attending zero period, sixth period, and an outside class at night. The law intends to allow students who participate in sports to make up assignments, tests, etc. when missing for travel to away games, for example, and not be punished academically, or when a senior needs a class that is REQUIRED to graduate on time. In this case, it is being applied to get this person [M.L] ahead of everyone else. My daughter could've graduated early, but she is being held to the expectation that she MUST be at practice in order to compete. She is being treated unequally and disadvantageously.

d.     My cisgender daughter, is held to the ALL policies in the team handbook yet this person [M.L] is not required to follow them. Again, why is my daughter being held to tougher standards in order to race?

e.     Varsity athletes are held to EVEN higher standards and requirements in order to be on Varsity. My daughter meets all of these requirements, but she has been bumped down to JV now and this athlete [M.L.] has been moved up to Varsity, despite only meeting one requirement and not attending any practices. My daughter is a Team Captain and was an Athlete of the Meet in Clovis. My daughter has been a dedicated member on the Varsity team and now that rules are being changed for this person [M.L.], it has unfairly displaced my daughter because she is not transgender.

*Id.*

98.     On October 25, 2024, the Title IX coordinator for the District, Bethany Scott, informed T.S.'s mother that the District would begin a "formal investigation."

99.     Ms. Scott also informed T.S.'s mother that Defendant Chann had stated that T.S. would not be harmed by running with the Junior Varsity team at the Mt. SAC Invitational.

100.    T.S.'s mother informed Ms. Scott that T.S. would be harmed because she would miss out on the opportunity to be recognized by college scouts at the Mt. SAC invitational.

101.    On or about November 1, 2024, after T.S.'s mother followed up on two separate occasions regarding the Title IX complaint, the District informed T.S. that the Title IX complaint was being converted to a confidential personnel matter rather than a gender discrimination complaint because "[t]he allegations, even if true, would not support a finding of sex-based discrimination."

102.    M.L. was placed on the girls' Varsity Top 7 despite not regularly attending cross-country practices (as required by the Handbook), attending only a portion of the practices, or showing any effort to be a part of the girls' Varsity Top 7.

**E.      DEFENDANTS' SPEECH POLICY**

103.    Defendant District approved and enacted Board Policy 5132: Dress and Grooming on or about June 26, 2018 (hereinafter, "Speech Policy"). A true and correct copy of the Speech Policy is attached as **Exhibit 3**.

104.    Defendants Iacuone and Chann, as District administrators, had unbridled discretion to enforce the Speech Policy against K.S. and T.S.

105.    The Speech Policy "provides guidance to school sites to maintain safe, healthy, and effective learning environments." *See* **Exhibit 3**.

106.    The Speech Policy includes a section entitled "Students Cannot Wear" which incorporates Defendants' Speech Policy. *Id.*

107.    Students cannot wear clothing or accessories with images or language that:

(a)    Is violent

(b)    Depicts drugs or alcohol (or any illegal item or activity) or their use

(c)    Includes hate speech, profanity, or pornography (including symbols)

(d)    Is likely to create a hostile or intimidating environment based on any protected class.

*Id.*

108.    If a student violates the dress code, school sites "will implement progressive interventions," including:

(a)    Warning and self-correct dress code violation

(b)    Offer students a change of nondescript and/or school-specific clothing

(c)    Offer parent/guardian the opportunity to bring a change of clothes.

*Id.*

109.    "Repeated violations may result in a parent-school conference and/or other means of correction." *Id.*

110.    Under the Speech Policy, school officials can censor expression that they deem inappropriate or that they subjectively determine targets a certain group even if this expression is not materially and substantially disruptive.

## F.    CENSORSHIP OF PLAINTIFFS' SPEECH

111.    On or about October 26, 2024, while attending the Mt. SAC Invitational, approximately 18-20 parents and grandparents of MLKHS student athletes wore t-shirts with the message "Save Girls' Sports" on the front of the shirt and the message "It's Common Sense. XX ≠ XY" on the back of the shirt (hereinafter, "'Save Girls' Sports' shirts"). These are pictures of the front and back of the "Save Girls' Sports" shirts:

 

14

112.    Three MLKHS student athletes, including K.S. and T.S. and the student athlete who opted out of her girls' Varsity Top 7 position, wore the "Save Girls' Sports" shirts. K.S. and T.S. wore their "Save Girls' Sports" shirts at the end of their races, while the other student athlete wore the shirt during the whole meet. This is a picture of K.S. and T.S. wearing their "Save Girls' Sports" shirts:



113.    Parents from Santiago High School, another school in attendance at the Mt. SAC Invitational, wore shirts with the message, "Protect Women's Sports XY Does Not Equal XX."

114.    The winner of the Girls' Sweepstakes Race, a female student from Santiago High School, put her "Protect Women's Sports XY Does Not Equal XX" shirt on as soon as she crossed the finish line. This is a picture of the shirt this female student athlete wore:



115.    To Plaintiffs' knowledge, no student, parent, or District employee complained about the "Save Girls' Sports" shirts during or following the Mt. SAC Invitational to the District, to K.S.

or T.S., or to their parents. In fact, there was no disruption that occurred at the Mt. SAC Invitational as a result of the shirts.

116. On or about November 1, 2024, K.S. and T.S. wore the "Save Girls' Sports" shirts to their cross-country practice.

117. K.S. and T.S. are Christians with sincerely held religious beliefs regarding human identity. They believe that God created boys and girls with unique biological differences.

118. To K.S. and T.S., the expressions "Save Girls' Sports" and "It's Common Sense. XX ≠ XY" are intended to express their religious viewpoint and to advocate for the protection of fair competition for girls based on biological sex.

119. K.S. and T.S. are advocates of fairness and equal opportunities within girls' sports, including on their cross-country team.

120. The messages on the shirts were not directed toward any teammate or student or individual.

121. At this November 1 practice, no student complained about the "Save Girls' Sports" shirts to K.S. or T.S or was visibly upset by the girls' shirts. There was no disruption whatsoever at the school or within the practice as a result of the shirts.

122. During this cross-country practice, Defendant Chann approached K.S. and T.S. and told them they needed to remove their shirts or wear their shirts inside out so the "Save Girls' Sports" messaging could not be seen.

123. When K.S. and T.S. asked why Defendant Chann was asking them to change their shirts, Defendant Chann expressed that the shirts' messages created a "hostile" environment.

124. K.S. and T.S. further asked how the shirts created a "hostile" environment and Defendant Chann stated that wearing the "Save Girls' Sports" shirts was analogous to a student who wore a shirt with a swastika in front of a Jewish student.

125. T.S. asked Defendant Chann whether bracelets or messages expressing viewpoints different from T.S.'s or those considered hostile by T.S. would be allowed. Defendant Chann responded that such items and messages would be permitted.

VERIFIED COMPLAINT

126.    T.S. apologized, and though in disagreement to Defendant Chann's directive to change their shirts, K.S. and T.S. changed their shirts so they could continue to participate in practice.

127.    M.L. was not in attendance at this practice when Defendant Chann directed Plaintiffs to change their shirts.

128.    Following the censorship of the messages on Plaintiffs' shirts, K.S.'s mother contacted the District asking for further explanation as to why K.S. was directed to remove her "Save Girls' Sports" shirts. *See* **Exhibit 4**.

129.    Following the censorship of the messages on Plaintiffs' shirts, T.S.'s mother contacted the District asking for further explanation as to why T.S. was directed to remove her "Save Girls' Sports" shirts. *See* **Exhibit 5**.

130.    On or about November 4, 2024, T.S.'s mother filed a Uniform Complaint regarding the November 1 shirt incident. *See* **Exhibit 6**.

131.    To date, T.S.'s mother has not received a response to her Uniform Complaint.

132.    On or about November 4, 2024, Defendant Chann responded to T.S.'s mother's inquiry and wrote, "I am looking into a couple of things, and I will get back to you as soon as possible." *See* **Exhibit 5**.

133.    On or about November 5, 2024, Defendant Chann responded to K.S.'s mother's inquiry and wrote, "We are working on a few things and hope to have something for you soon." *See* **Exhibit 4**.

134.    On or about November 5, 2024, T.S.'s mother reached out to the Equity Officer and to the School Board Executive Assistant requesting an explanation regarding the t-shirt censorship issue.

135.    The School Board Executive Assistant asked whether T.S.'s mother would like her to forward this communication to the Riverside Unified School District Board of Education. T.S.'s mother confirmed that she wanted her communication to be forwarded.

136.    To date, T.S.'s mother has not received a response from any of these individuals or members addressing the t-shirt censorship issue.

VERIFIED COMPLAINT

137.    On or about November 6, Defendant Iacuone sent separate written responses to Plaintiffs' mothers with the same message addressing the t-shirt incident.

138.    Defendant Iacuone referenced District dress code and stated that the "Save Girls' Sports" shirts "create a hostile environment for one of the athletes on the team." She stated, "[T]he t-shirts are reasonably understood as being directed at a specific transgender athlete on the team, and reasonably may be understood as intended to intimidate, belittle, or hurt that athlete."

139.    Defendant Iacuone reiterated Defendant Chann's example that similarly "a student who wore a shirt with a swastika to school was creating a hostile environment for Jewish students." *Id.*

140.    Defendant Iacuone stated that "[i]t is standard practice at MLKHS that when students are in violation of the dress code, administrators explain the violation, ask the student to change and offer an alternative clothing article so they can continue about their day without disruption." *Id.*

141.    Defendant Iacuone confirmed that the interaction that took place between K.S. and T.S. and Defendant Chann was done "in accordance with this process."

142.    Defendant Iacuone also stated that if there was ever something that Plaintiffs deemed "hostile," they would need to go to Student Support Services and file an incident report.

143.    On information and belief, no incident report was filed regarding Plaintiffs' "Save Girls' Sports" shirts.

144.    In Plaintiffs' experiences, many of their teammates agree with their views of human identity, sex, and gender but are afraid to express their views because of the social consequences of expressing a view that differs from the view promoted by authority figures in the school community.

145.    K.S. and T.S. respect the right of others to express views that differ from their own. They seek only the right to engage with the topics that are already being addressed and to express their own views on these topics.

146.    Defendants regularly permit K.S. and T.S.'s teammates and classmates to wear clothing and apparel with various political, social, and religious messages on them.

147.    To date, K.S. and T.S. have only received positive comments from their teammates regarding their "Save Girls' Sports" shirts.

148.   Defendants' Speech Policy is, on its face, and as applied in this case, overbroad, impermissibly vague and subject to abuse. This policy effectively grants unbridled discretion to school officials as to its application and it therefore violates the First and Fourteenth Amendments of the United States Constitution.

149.   Since Defendants, and each of them, have established and are maintaining under color of law of the State of California a policy of denying K.S. and T.S. freedom of expression, Plaintiffs have suffered, are suffering, and will continue to suffer severe and irreparable injury by virtue of Defendants' acts, policies and practices as set forth herein. Their fundamental constitutional rights have been violated and will continue to be violated.

150.   K.S. and T.S. want to continue wearing their "Save Girls' Sports" shirts to advocate for equal opportunities for females in sports.

151.   K.S. and T.S. are refraining from wearing their "Save Girls' Sports" shirts or other shirts bearing similar messages out of fear that they will again be found to have violated the Defendants' Speech Policy challenged herein, and thus be subject to punishment.

152.   The acts of Defendants, and each of them, are chilling and deterring Plaintiffs' free exercise of rights of speech. Plaintiffs have no plain, adequate, or complete remedy at law to redress the violations of their rights, and this suit for injunction, declaratory judgment, and damages is their only means of securing complete and adequate relief. No other remedy would offer Plaintiffs substantial and complete protection from continuation of Defendants' unlawful and unconstitutional acts, policies, and practices.

## FIRST CAUSE OF ACTION

## FIRST AMENDMENT: FREEDOM OF SPEECH

### (42 U.S.C. § 1983)

### (As Against All Defendants)

153.   Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 152 of this Complaint.

154.   Students do not shed their constitutional rights at the schoolhouse gate.

155.    K.S. and T.S.'s expression is fully protected under the First Amendment, which prohibits the government from "abridging the freedom of speech." This prohibition applies to state and local governments through the Fourteenth Amendment.

156.    Non-disruptive, individual student expression is protected by the First Amendment of the United States Constitution.

157.    Defendant District approved and enacted the Speech Policy.

158.    Pursuant to Defendants' Speech Policy, Defendants Iacuone and Chann, as District administrators, singled out Plaintiffs' expression and have prevented them from displaying their messages on their shirts at MLKHS.

159.    K.S. and T.S.'s expression—wearing a shirt with the messages "Save Girls' Sports" and "It's Common Sense. XX ≠ XY"—did not and does not materially and substantially interfere with the orderly conduct of educational activity at MLKHS.

160.    Defendants' Speech Policy is vague and overbroad because it restricts student speech that does not and will not materially and substantially disrupt the educational process.

161.    Defendants' Speech Policy discriminates against speech because of its content.

162.    Defendants' Speech Policy discriminates against speech on the basis of the speaker's viewpoint.

163.    Defendants' Speech Policy restrains constitutionally protected speech in advance of its expression, with virtually no guidelines or standards to guide the discretion of school officials charged with enforcing the Policy.

164.    Defendants' Speech Policy chills the free speech of Plaintiffs and other students.

165.    Defendants' Speech Policy allows the exercise of unbridled discretion.

166.    Defendants' Speech Policy improperly prohibits speech merely because it may allegedly be "hostile."

167.    Defendants censor Plaintiffs' shirts but permit other students to wear apparel with different messages and the District to display messages on related topics.

168.    Defendants censor Plaintiffs' shirts but permit other students to wear apparel with different messages on different types of topics.

169.    Defendants have no compelling reason that would justify their censorship of Plaintiffs' "Save Girls' Sports" shirts.

170.    Defendants have no compelling or legitimate reason that would justify their censorship of the messages that Plaintiffs seek to express.

171.    Defendants' Speech Policy and practice are not reasonably related to any legitimate pedagogical concerns.

172.    Defendants' policies, and the enforcement thereof, thus violate the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment.

173.    Plaintiffs respectfully pray the Court grant the equitable and legal relief set forth in the prayer for relief.

**SECOND CAUSE OF ACTION**

**FOURTEENTH AMENDMENT: DUE PROCESS**

**(42 U.S.C. § 1983)**

**(As Against All Defendants)**

174.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 173 of this Complaint.

175.    The Speech Policy is vague and lacks sufficient objective standards to curtail the discretion of school officials, which allow Defendants to enforce the policies in an *ad hoc* and discriminatory manner.

176.    Defendant District approved and the Speech Policy.

177.    Defendants Iacuone and Chann, as District administrators, had unbridled discretion to enforce the Speech Policy against K.S. and T.S.

178.    The Speech Policy requires Defendants to arbitrarily determine what is and is not "likely to create a hostile or intimidating environment based on any protected class."

179.    Students of common intelligence must guess as to whether their expression is "likely to create a hostile or intimidating environment based on any protected class."

180.    Defendants' Speech Policy and practice allow school officials to act with unbridled discretion when deciding whether student expression is "likely to create a hostile or intimidating environment based on any protected class."

181.    Defendants have no compelling reason that would justify their censorship of the expression on Plaintiffs' "Save Girls' Sports" shirts.

182.    The Speech Policy, and Defendants' enforcement thereof, therefore, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

183.    Plaintiffs respectfully pray the Court grant the equitable and legal relief set forth in the prayer for relief.

### THIRD CAUSE OF ACTION

### TITLE IX: SEX DISCRIMINATION

### FAILURE TO PROVIDE EQUAL TREATMENT, BENEFITS, AND OPPORTUNITIES

### (As Against All Defendants)

184.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 183 of this Complaint.

185.    All Defendants are subject to the obligations of Title IX.

186.    MLKHS participates in the California Interscholastic Federation.

187.    Defendant District approved and enacted Board Policy 6145.2: Athletic Competition.

188.    Pursuant to Board Policy 6145.2, Defendants Iacuone and Chann, as District administrators, are responsible for site-level decisions over MLKHS athletic activities.

189.    Pursuant to Board Policy 6145.2, school officials "shall ensure that equivalent athletic opportunities are provided for males and females."

190.    All Defendants have chosen to provide athletic opportunities in cross-country separated by sex.

191.    As a result, all Defendants have an obligation to ensure that female athletes receive equivalent treatment, benefits, and opportunities in athletic competition as compared to boys.

192.    Equivalent treatment and opportunities require equal opportunities to engage in post-season competition, and more broadly the right to be free of any policies which are "discriminatory in language or effect" or have the effect of denying "equality of athletic opportunity."

193.    As detailed herein, Defendants deprived Plaintiff T.S. of equal opportunities to engage in competition.

194.    Female athletes should be treated at least equally to transgender students in terms of qualifying for varsity sports.

195.    Defendants exercised the discretion granted to them to unlawfully discriminated against T.S. when they collectively chose M.L., a biological male, to displace T.S. on the girls' Varsity Top 7, despite M.L. not satisfying many of the varsity qualifications.

196.    M.L. has consistently missed practices, attending only 13 out of the 74 practices held between August 2024 and October 2024, and attending approximately only the last 50-60 minutes of the two+ hour practices when in attendance. Meanwhile, T.S., as team captain, has shown a concerted effort, strong work ethic, and desire to be on the girls' Varsity Top 7, attending all practices and races and training diligently for the entirety of practices.

197.    The MLKHS varsity coach initially identified T.S. on the Varsity Top 7 list for the Mt. SAC Invitational. However, Defendant Chann intervened, modified the list, and place M.L. on the Varsity Top 7 replacing T.S.

198.    Rather than equally apply the varsity qualifications to all students, Defendants chose to favor M.L. over T.S. because M.L. is transgender.

199.    Defendants' decision to displace T.S. resulted in T.S. being disqualified from racing on the varsity team at the Mt. SAC Invitational.

200.    This practice is discriminatory in effect, and denies T.S., a female, equality in athletic opportunities, including equal opportunity to achieve and be recognized for victory.

201.    As a result of Defendants' actions, T.S. missed opportunities to compete at a high-profile meet, losing valuable chances for college recruitment and recognition.

202.    T.S. is harmed by Defendants' failure to provide competitive opportunities that fairly and effectively accommodate her athletic abilities.

203.    Such harm includes loss of the experience of fair competition; loss of victories and the public recognition associated with victories; loss of opportunities to advance to higher-level competitions; loss of visibility to college recruiters; emotional distress, pain, anxiety, and other damages to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief against defendants as follows:

1.    That this Court issue a Declaratory Judgment, declaring Defendants' Speech Policy prohibiting messages that are "likely to create a hostile or intimidating environment based upon any protected class" on clothing unconstitutional, facially and as applied to K.S. and T.S.'s speech;

2.    Injunctive relief enjoining Defendants, their officials, agents, employees, and all persons in active concert or participation with them, from enforcing Defendants' Speech Policy challenged herein both facially and as applied to the extent the Speech Policy prohibits K.S. and T.S. from wearing a shirt with the messages "Save Girls' Sports" and "It's Common Sense. XX ≠ XY" or similar messages at MLKHS;

3.    A declaration that Defendants have violated Title IX by failing to provide equal treatment, benefits, and opportunities for girls in athletic competition;

4.    An award of nominal compensatory damages and other monetary relief as permitted by law;

5.    For costs, attorneys' fees and interest, as allowed by law; and

6.    For such other relief the Court determines is proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury.


DATED:  November 20, 2024              ADVOCATES FOR FAITH & FREEDOM

                                    By: _____
                                        Julianne Fleischer, Esq.
                                        Attorneys for Plaintiffs

VERIFIED COMPLAINT

**VERIFICATION**

I have read the foregoing **VERIFIED COMPLAINT FOR INJUNTIVE AND DECLARATORY RELIEF AND DAMAGES** and know its contents.

I am a party to this action. The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 20, 2024, at Riverside, California.

Ryan Starling (Nov 20, 2024 09:36 PST)

_____
T.S., a minor by and through her father and natural guardian, RYAN STARLING

1   **VERIFICATION**

2   I have read the foregoing **VERIFIED COMPLAINT FOR INJUNTIVE AND**

3   **DECLARATORY RELIEF AND DAMAGES** and know its contents.

4   I am a party to this action.  The matters stated in the foregoing document are true of my own

5   knowledge except as to those matters which are stated on information and belief, and as to those

6   matters, I believe them to be true.

7   I declare under penalty of perjury under the laws of the State of California that the foregoing

8   is true and correct.

9   Executed on November 20, 2024, at Riverside, California.

10

11   *Cynthia Slavin*
     Cynthia Slavin (Nov 20, 2024 09:45 PST)

12   K.S., a minor by and through her mother and
     natural guardian, CYNTHIA SLAVIN

13

14   *Dan Slavin*
     Dan Slavin (Nov 20, 2024 09:51 PST)

15   K.S., a minor by and through her father and
     natural guardian, DANIEL SLAVIN and
16   CYNTHIA SLAVIN

17

18

19

20

21

22

23

24

25

26

27

28