UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—
GENERAL

| Case No. | 5:24-cv-02480-SSS-SPx | Date | September 24, 2025 |
|---|---|---|---|
| Title | *T. S. et al. v. Riverside Unified School District et al.* | | |

Present: The Honorable    SUNSHINE S. SYKES, UNITED STATES DISTRICT JUDGE

| Irene Vazquez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    (IN CHAMBERS) ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT RIVERSIDE UNIFIED SCHOOL DISTRICT'S MOTION TO DISMISS AND GRANTING THE STATE OF CALIFORNIA'S MOTION TO DISMISS [DKT. NOS. 37, 41]**

Before the Court are Defendants Riverside Unified School District, Leann Iacune, and Amanda Chann's (School Defendants) Motion to Dismiss Plaintiffs' First Amended Complaint for Failure to State a Claim or For a More Definite Statement, as well as State Superintendent of Public Instruction Tony Thurmond and Attorney General Rob Bonta's (State Defendants) Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Subject Matter Jurisdiction and for Failure to State a Claim.  [Dkt. No. 28, "FAC"; Dkt. No. 37, "School MTD"; Dkt. No. 41, "State MTD"].

The Court **GRANTS IN PART** and **DENIES IN PART** the School Defendants' Motion to Dismiss and **GRANTS** the State Defendants' Motion to Dismiss.  The Court grants Plaintiffs leave to amend their dismissed claims.

# I.    FACTUAL AND LEGAL BACKGROUND

The Court briefly recounts the relevant facts as alleged in the First Amended Complaint.

The Court uses the same terms the Ninth Circuit used in its recent decision in *Hecox v. Little*. *Hecox v. Little*, 104 F.4th 1061 (9th Cir. 2024), *as amended* (June 14, 2024), *cert. granted*, No. 24-38, 2025 WL 1829165 (U.S. July 3, 2025). As the Court explained:

> "Gender identity" is "the term used to describe a person's sense of being male, female, neither, or some combination of both." A person's "sex" is typically assigned at birth based on an infant's external genitalia, though "external genitalia" do not always align with other sex-related characteristics, which include "internal reproductive organs, gender identity, chromosomes, and secondary sex characteristics." A "transgender" individual's gender identity does not correspond to their sex assigned at birth, while a "cisgender" individual's gender identity corresponds with the sex assigned to them at birth.

*Id.* at 1068–69 (citations omitted). Throughout its decision, the Court will use the terms "cisgender girl" and "transgender girl" to refer to the relevant parties.

In California, state law requires the inclusion of transgender students in athletic programs. Under Assembly Bill (AB) 1266, students must be "permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on the pupil's records." *See* Cal. Educ. Code § 221.5(f).

The individual plaintiffs in this case are two cross-country athletes and cisgender women at Martin Luther King High School, part of the Riverside Unified School District, in Riverside, California. [FAC ¶ 28]. Plaintiff K.S. is in the ninth grade. [*Id.*]. Plaintiff T.S. is in the eleventh-grade and captain of the cross-country

team. [*Id.*].[1]  Both allege they were negatively impacted by AB 1266, and in the wake of that conflict, that their First Amendment Rights were violated.

The third plaintiff is Save Girls' Sports (SGS), a California unincorporated association "comprised of students and parents in California who are subject to state and local policies that discriminate based upon biological sex." [*Id.* ¶ 17]. SGS has "student members throughout California Schools" including T.S. and K.S., as well as other students at Martin Luther King High School, in the district, and throughout California. [*Id.*].

Plaintiff K.S. is in her first-cross country season, and is on the junior varsity team. [*Id.* ¶ 82].  K.S. "consistently rank[s] between second and third on the Junior Varsity Team." [*Id.*].  Plaintiff T.S. is in her third cross-country season, has received accolades such as "Most Improved" and "Athlete of the Meet," and has served as the Team Captain since August 2024. [*Id.* ¶¶ 86–87, 89].  Since the start of the cross-country season in August 2024, K.S. and T.S. have attended every practice. [*Id.* ¶ 90].

Another student on Martin Luther King High School's cross country team is M.L. [*Id.* ¶ 115].  M.L. is a transgender girl. [*Id.*].  She transferred to Martin Luther King High School from another school in the district in June 2024. [*Id.* ¶ 120].  At her previous high school, M.L. ranked first and broke the girls' all-time cross-country record. [*Id.* ¶¶ 121–22].

In August 2024, T.S. qualified for the Varsity Top 7 lineup. [*Id.* ¶ 90]. Which runners make the Varsity Top 7 is "typically left to the coaching staff's discretion based on the following criteria: (1) previous race times, (2) practice attendance, (3) 'varsity-level effort' at practice during the week (or specifically a lack of it), (4) attitude, (5) long-term team strategy by the coaching staff, (6) illness/injury, (7) varsity "exposure," and (8) other unforeseen issues." [*Id.* ¶ 100 (citation omitted)].  In addition to these criteria, there is an attendance policy that permits one unexcused workout "without potential consequences," and after a second missed workout "participation in the next race is by coaches' discretion, but will usually result in missing the race." [*Id.* ¶¶ 101–02].  For those on the varsity team, there are three morning practices and five afternoon practices each week. [*Id.* ¶ 106].  The Varsity Top 7 is updated before every meet. [*Id.* ¶ 114].

_____

[1] Plaintiffs appear through their parents Ryan Starling, Daniel Slavin, and Cynthia Slavin.  [FAC ¶¶ 20–22].

The runners in Martin Luther King High School's Varsity Top 7 are regularly invited to the annual Mt. SAC Cross Country Invitational ("Mt. SAC Invitational"), a "premier cross-country event" that attracts runners from around the state and country. [*Id.* ¶¶ 107–08]. The event was held on October 25 and 26, 2024. [*Id.* ¶ 109]. The event is broadcast, and college scouts and coaches often attend or watch the Mt. SAC Invitational to scout and recruit athletes. [*Id.* ¶¶ 111–12].

Around October 19, 2024, M.L. competed at her first varsity race with the girls' cross-country team. [*Id.* ¶ 116]. Her time was 19:41. [*Id.*]. T.S.'s time was 20:42. [*Id.* ¶ 117].

On October 22, 2024, the school released an updated Varsity Top 7 list ahead of the Mt. SAC Invitational. [*Id.* 118]. While the varsity coach "initially identified" T.S. as on the Varsity Top 7 list, Defendant Amanda Chann, Martin Luther King High School's Athletic Director and Assistant Principal, "intervened, modified the list, and place [sic] M.L. on the Varsity Top 7 replacing T.S." [*Id.* at 123]. As a result, T.S. could not compete in the Mt. SAC Invitational with the varsity team, though could "run[] with the Junior Varsity team." [*Id.* ¶ 124, 146].

Throughout the season, M.L. attended only 13 of 74 practices between August and October 2024. [*Id.* ¶ 127]. When M.L. was at practice, Chann would join M.L. in her runs, and the two would run separately from the other team members. [*Id.* ¶¶ 128–30].

While K.S. was never on the Varsity Top 7, because she ranked highly on the Junior Varsity Team, she was "one of the immediate contenders for the Varsity Top 7" in the event of injury. [*Id.* ¶ 137]. Both K.S. and T.S. attended all practices and otherwise complied with the varsity eligibility requirements. [*Id.* ¶¶ 131, 138].

After M.L. made the Varsity Top 7, another member of the Varsity Top 7 and member of Save Girls' Sports, M.K., resigned her position in solidarity with T.S. [*Id.* ¶ 139].

On October 24, 2024, the day before the Mt. SAC Invitational, T.S.'s parents met with Defendant Chann and Defendant Iacuone, the Principal of Martin Luther King High School. [*Id.* ¶¶ 26, 141]. At the meeting, T.S.'s parents addressed the criteria for the Varsity Top 7 and the attendance policy with Defendants. [*Id.* ¶ 142].

Immediately following the meeting, T.S.'s mother filed a Title IX complaint with the District, alleging gender discrimination and again citing the requirements

for the Varsity Top 7 and the attendance policy, among other grounds. [*Id.* ¶ 144]. The next day, the District's Title IX coordinator stated she was beginning a formal investigation. [*Id.* ¶ 145]. However, on November 1, 2024, the District stated the "the Title IX complaint was being converted to a confidential personnel matter rather than a gender discrimination complaint because '[t]he allegations, even if true, would not support a finding of sex-based discrimination.'" [*Id.* ¶ 148].

Through the remainder of the season, M.L. continued to succeed, placing fourth and sixth at two meets and receiving the "MLKHS Senior Girl" award for the fastest runner. [*Id.* ¶¶ 150–52].

Turning back, however, to the day of the Mt. SAC Invitational, in protest of the decision to place M.L. in the Varsity Top 7, "approximately 18-20 parents and grandparents of MLKHS student athletes wore t-shirts with the message 'Save Girls' Sports' on the front of the shirt and the message 'It's Common Sense. XX ≠ XY.'" [*Id.* ¶ 161]. T.S., K.S., and M.K., also wore the shirts. [*Id.* ¶ 162].

About a week after the meet, K.S. and T.S. wore the Save Girls' Sports shirts to cross country practice. [*Id.* ¶ 167]. During the practice, Chann asked K.S. and T.S. to change their shirts, or wear them inside out so the message was no longer visible. [*Id.* ¶ 175]. Chann compared wearing the shirts to wearing "a shirt with a swastika in front of a Jewish student." [*Id.* ¶ 177]. In response to a question from T.S., Chann stated that messages "expressing viewpoints different from T.S.'s or those considered hostile by T.S. would not be allowed." [*Id.* ¶ 178].

After this incident, K.S.'s mother reached out to Chann and Iacuone requesting further explanation as to why K.S. was asked to remove the shirt at practice. [*Id.* ¶ 181]. Chann responded that she was working on the issue and would respond soon. [*Id.* ¶ 184].

Likewise, T.S.'s mother reached out to the District to request an explanation about the incident. [*Id.* ¶ 182]. Chann again responded that she was working on the issue and would respond soon. [*Id.* ¶ 183]. T.S.'s mother also filed a Uniform Complaint, and reached out to the Equity Officer, the Deputy Superintendent, and the School Board Executive Assistant. [*Id.* ¶¶ 185–86].

Chann then sent separate messages to K.S. and T.S.'s mothers. In each she stated that the shirts "create a hostile environment for one of the athletes on the team." [*Id.* ¶ 189]. She further stated, "[T]he t-shirts are reasonably understood as being directed at a specific transgender athlete on the team, and reasonably may be understood as intended to intimidate, belittle, or hurt that athlete." [*Id.*]. Iacuone

explained that "[i]t is standard practice at MLKHS that when students are in violation of the dress code, administrators explain the violation, ask the student to change and offer an alternative clothing article so they can continue about their day without disruption." [*Id.* ¶ 191]. According to Plaintiffs, the District "regularly permit[s]" their teammates and classmates to wear clothing with political messaging on it. [*Id.* ¶ 198].

About a month later, on December 4, over 100 students, including members of Save Girls' Sports, wore the same shirts to school. [*Id.* ¶ 200]. District administrators "detained" several students for several hours for wearing the shirts. [*Id.* ¶ 203]. Students A.S. and L.S., members of Save Girls' Sports, and M.P., were all told they could not wear the shirts. [*Id.* ¶ 204]. After spending three hours in the office, the students agreed to cover their shirts and returned to class. [*Id.* ¶ 212].

Plaintiffs allege their message was comparable to displaying pride flags, or wearing bracelets expressing support for their LGBTQ+ community, which the District permitted. [*Id.* ¶¶ 207, 209]. District administrators explained those issues had not been presented to them. [*Id.* ¶ 208].

The next day, students L.S. and M.P. were called in to meet with District administrators, including Iacuone and Bethany Scott, the Title IX coordinator. [*Id.* ¶ 215]. Scott stated the students would "not be protected in this situation" as "'white, straight females.'" [*Id.* ¶ 217].

On November 20, 2024, Plaintiffs filed this lawsuit. [Dkt. No. 1]. On January 31, 2025, pursuant to a stipulation, Plaintiffs amended their complaint. [FAC].

On February 28, 2025, the School Defendants filed a motion to dismiss. [School MTD]. Plaintiffs opposed, and the School Defendants replied. [Dkt. No. 38, "School MTD Opp'n"; Dkt. No. 39, "School Reply"]. [2]

---

[2] There are several pending requests for judicial notice. [Dkt. Nos. 37-2, 38-1, 42, 47, 64 & 65]. Because the Court does not rely on any of these documents in its Order, the requests are **DENIED AS MOOT**. The parties are welcome to renew their requests as necessary in future motions.

On March 28, 2025, the State Defendants filed a motion to dismiss. [State MTD]. Plaintiffs opposed, and the State Defendants replied. [Dkt. No. 46; "State MTD Opp'n"; Dkt. No. 48, "State MTD Reply"].

On May 28, 2025, the United States filed a Statement of Interest, to which the School District and State both replied. [Dkt. No. 54, "Statement"; Dkt. No. 55, "School SoI Reply"; Dkt. No. 56, "State SoI Reply"].[3]

On June 26, 2025, the Court denied School Defendants' Motion to Disqualify. [Dkt. No. 66].

## II.    LEGAL STANDARD

### A.    Motion to Dismiss Under Rule 12(b)(1)

"[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). To have Article III standing, Plaintiffs must show: (1) an "injury in fact," (2) "causation," and (3) "a likelihood that a favorable decision will redress the plaintiff's alleged injury." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). To meet the first element of Article III standing, a Plaintiff must allege an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citing *Lujan*, 504 U.S. at 560–61). "Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021).

---

[3] The Court "accepts [the Statement of Interest] as an amicus brief." *United States ex rel Hooper v. Lockheed Martin Corp.*, No. CV0800561BROPJWX, 2014 WL 12561070, at *4 (C.D. Cal. Jan. 17, 2014). However, "[i]n the future, the United States must file any statement of interest no later than the deadline for the non-moving party to file an opposition brief so that the moving party has an opportunity to respond." *United States ex rel. Martinez v. Orange Cnty. Glob. Med. Ctr., Inc.*, No. 815CV01521JLSDFM, 2017 WL 9482462, at *1 n.1 (C.D. Cal. Sept. 14, 2017).

**B.    Motion to Dismiss under Rule 12(b)(6)**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims in a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal of a claim is proper under Rule 12(b)(6) when a plaintiff "fails to state a cognizable legal theory or fails to allege sufficient factual support for its legal theories." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016). To survive a Rule 12(b)(6) motion, a plaintiff must allege sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In analyzing a motion to dismiss, a court must accept as true all material factual allegations and draw all reasonable inferences in the non-moving party's favor. *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). A court need not accept, however, "a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). When reviewing a Rule 12(b)(6) motion, a court must consider the complaint in its entirety and any attached documents, documents incorporated by reference, or matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). If a complaint fails to state a plausible claim, a court should freely grant leave to amend under Federal Rule of Civil Procedure 15(a)(2) even if such a request was not made, unless amendment would be futile. *Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012).

**C.    Motion for a More Definite Statement Under Rule 12(e)**

Federal Rule of Civil Procedure 12(e) allows a party to move for a more definite statement when the complaint "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." Fed. R. Civ. P. 12(e). "A motion for [a] more definite statement pursuant to Rule 12(e) attacks the unintelligibility of the complaint, not simply the mere lack of detail, and therefore, a court will deny the motion where the complaint is specific enough to apprise the defendant of the substance of the claim being asserted." *Beery v. Hitachi Home Elecs. (Am.), Inc.*, 157 F.R.D. 477, 480 (C.D. Cal. 1993). "If the detail sought by a motion for more definite statement is obtainable through discovery, the motion should be denied." *Id.*; *see also Famolare, Inc. v. Edison Bros. Stores, Inc.*, 525 F. Supp. 940, 949 (E.D. Cal. 1981).

Under the liberal federal pleading standards, all that is required of a complaint is "a short and plain statement of the claim" that gives the defendant

"fair notice of what the plaintiff's claim is and the grounds upon which it rests."
Fed. R. Civ. P. 8(a); *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (1957).
Therefore, a Rule 12(e) motion may not be used to compel the plaintiff to set forth
"the statutory or constitutional basis for his claim, only the facts underlying it."
*McCalden v. Cal. Library Ass'n*, 955 F.2d 1214, 1223 (9th Cir. 1990).

## III.   DISCUSSION

Plaintiffs bring seven claims against Defendants: (1) a facial First
Amendment claim against Defendants Iacuone and Chann; (2) an as-applied First
Amendment claim against Defendants Iacuone and Chann; (3) a Fourteenth
Amendment Due Process claim against Defendants Iacuone and Chann; (4) a Title
IX sex discrimination claim against all Defendants; (5) a Title IX Effective
Accommodation Violation claim against all Defendants; (6) a Title IX Equal
Treatment claim against all Defendants; (7) a state-law gender discrimination
claim brought under California Education Code § 220 brought against all
Defendants.  [FAC].  Claims Five and Six challenge AB 1266.

In the School Defendants' Motion, they only seek dismissal of Claims Four,
Five, Six, and Seven.[4]  School Defendants seek to dismiss Claims Four and Seven
for failing to allege facts sufficient to constitute intentional discrimination.  They
seek to dismiss Claims Five and Six for lack of jurisdiction due to lack of standing,
or in the alternative for a more definite statement.

In the State Defendants' Motion, they move to dismiss Claims Four, Five,
Six, and Seven.  State Defendants raise standing challenges, statutory challenges,
and a sovereign immunity defense.

### A. Standing

A complaint must meet Article III's standing requirements to establish
subject matter jurisdiction.  *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir.
2011).  Plaintiffs must allege the following to establish standing: (1) "[plaintiffs]
must have suffered an injury in fact—an invasion of a legally protected interest
which is (a) concrete and particularized and (b) actual or imminent, not conjectural
or hypothetical," (2) "there must be a causal connection between the injury and the

---

[4] They do not move to dismiss Plaintiffs' Claims One, Two, or Three, which
are brought only against the School Defendants.  As such, those First and
Fourteenth Amendment claims survive.

conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court,"[5] and (3) "it must be likely as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (internal citations and quotations omitted).  A plaintiff must establish standing with respect to each claim and form of relief.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (requiring plaintiff to show standing separately for injunctive relief and civil penalties); *Wildearth Guardians v. United States EPA*, 759 F.3d 1064, 1070–1072 (9th Cir. 2014).

The Court begins its analysis of this case by breaking down the injuries and claims into parts.  Plaintiffs argue they were injured by the participation of a transgender girl, M.L., on their cross-country team.  As the Court reads the complaint, neither individual Plaintiff ever competed or placed lower at a competitive event because they never competed against M.L.[6]  Instead, the core of their injury is their intrateam placement on the Martin Luther King girls' cross-country team.  T.S. alleges injury because she was taken off the Varsity Top 7 for M.L., and K.S. alleges injury because even though she was not on the Varsity team, she had less opportunities to compete for a Varsity spot but for M.L.'s participation.  And both allege favorable treatment of M.L. by Chann.

The Court agrees Plaintiffs' alleged injuries are sufficient to establish standing for monetary relief but not the injunctive relief Plaintiffs request.  The Court finds the Second Circuit's decision in *Soule* persuasive.  *Soule v. Connecticut Ass'n of Sch., Inc.*, 90 F.4th 34 (2d Cir. 2023) (en banc) (describing the injury as the deprivation of the "opportunity to compete in fair and non-discriminatory high school track races.").  In *Soule*, four cisgender athletes challenged a state athletic association's policy permitting transgender athletes to participate on teams consistent with their gender identity.  In that case, every member of the Second Circuit, sitting en banc, held that a particularized allegation of the denial of equal athletic opportunity under Title IX on the basis of gender

---

[5] In this case, traceability is better addressed on a claim-by-claim basis, and the Court addresses whether each Defendant is appropriately sued in its merits analysis below.

[6] As background, Plaintiffs discuss other girls who competed against M.L. and placed lower as a result of her finish, but those other girls are not parties to this case, nor alleged to be members of Save Girls' Sports.  [FAC ¶¶ 151–52].

identity is sufficient to confer standing. To be particularized, it was sufficient to have "personally competed" in an athletic event against a transgender athlete to confer standing. *Id.* at 46.

Here, the framing of the injury is slightly different because, as discussed above, T.S. and K.S.'s competition against M.L. has never come in a race, but in intrateam placement. Nevertheless, for standing purposes, the fact the three are in direct competition for some meaningful placement is sufficient for this Court to decide the Plaintiffs have sufficiently alleged they have suffered an injury by way of their alleged deprivation of the "opportunity to compete in fair and non-discriminatory high school" cross country competition guaranteed by Title IX. *Id.* This type of injury can be remedied by money damages. *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75–76 (1992). As such, T.S. and K.S. have standing to seek monetary relief against both the State and School Defendants.[7]

For the purposes of standing to seek monetary damages, the Court declines to impose a requirement that T.S. or K.S. would have made the Varsity Top 7 but for M.L.'s participation. As courts have recognized throughout civil rights jurisprudence, it is the denial of the opportunity to compete without discrimination that is the cognizable injury for standing purposes, not the outcome of the competition. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995); *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (holding the "denial of equal treatment results from the imposition of the barrier, not the ultimate inability to obtain the benefit").

That said, the Court's decision on standing is not one on the merits. Whether Plaintiffs have stated Title IX discrimination and state-law discrimination claims will be discussed below. *See also Soule*, 90 F.4th at 40–41 ("[Q]uestions of standing and the availability of monetary damages have broad implications for all

---

[7] There are certainly additional injuries alleged—for example, the injury that occurred when Chann allegedly treated M.L. more favorably than cisgender athletes (by elevating M.L. over T.S. to the Varsity Top 7, laxly enforcing the attendance policy, and providing additional coaching). But those injuries are not in dispute. The only injury the parties actually dispute for standing purposes is the injury caused by the operation of AB 1266 alone—the mere permitting of transgender athletes to participate in athletics consistent with their gender identity. If that constitutes an injury, which the Court finds it does, then the injuries above and beyond that certainly confer standing as well.

manner of civil rights litigation and civil rights plaintiffs. Precedent and principle
require that we proceed cautiously before limiting access to courts and remedies.").

The Court next turns to the availability of injunctive relief. Plaintiffs request
only an injunction against "Defendants, their officials, agents, and employees from
enforcing and implementing AB 1266." [FAC].

Plaintiffs have not plausibly alleged they will continue to be injured in the
future. The only transgender athlete whose participation Plaintiffs allege they were
injured by is M.L. But as the State Defendants point out, there is no allegation
"that any transgender female athletes will be competing for a spot on the varsity
girls' cross-country team next season." [State MTD Reply at 3–4 n.5]. Indeed, the
First Amended Complaint describes M.L. as a "senior" who is attempting to
graduate early. [FAC ¶¶ 144, 359]. Absent a non-speculative allegation that
Plaintiffs will continue to compete against any transgender athletes, they lack
standing to enjoin the operation of AB 1266.[8] *See also Doe v. Horne*, 115 F.4th
1083, 1108 (9th Cir. 2024) (describing record evidence that in Arizona, over a
dozen year period, just seven out of 170,000 school athletes were transgender).
Additionally, the Court lacks any information as to whether and how AB 1266 is
enforced by Defendants—in other words, what an injunction would accomplish.

---

[8] The Court also notes there is no allegation that the transgender athletes
they will compete against (in a non-speculative manner) enjoy any particular
physiological advantages over cisgender girls, or even that M.L enjoys any
physical advantages over Plaintiffs due to her transgender status. While Plaintiffs
cite to the Ninth Circuit's decision in *Clark v. Arizona Interscholastic Ass'n*, 695
F.2d 1126, 1131 (9th Cir. 1982), more recent decisions reflecting contemporary
medical perspectives describe the relationship between sex and advantage in sports
in more nuanced terms. *Doe v. Horne*, 115 F.4th 1083, 1098 (9th Cir. 2024)
(holding it was not error for district court, with evidence before it, to find that
"transgender girls such as Plaintiffs, who begin puberty-blocking medication and
hormone therapy at an early age, 'do not have an athletic advantage over other
girls.'"); *see also B.P.J. by Jackson v. W. Virginia State Bd. of Educ.*, 98 F.4th 542
(4th Cir.), *cert. denied sub nom. W. Virginia Secondary Sch. Activities Comm'n v.
B. P. J. Next Friend Jackson*, 145 S. Ct. 568 (2024), *and cert. granted sub nom. W.
Virginia v. B. P. J.*, No. 24-43, 2025 WL 1829164 (U.S. July 3, 2025). In this case,
while M.L. ran a faster time than Plaintiffs, she was apparently not as fast as the
fastest girl on the team. [*Compare* FAC ¶ 116 *with id.* ¶ 339].

Finally, the Court addresses whether Save Girls' Sports has organizational standing to pursue Claims Four through Seven. Save Girls' Sports lacks standing based on its "diversion of resources" theory. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). [State MTD Opp'n at 13–14]. After *Hippocratic Medicine*, an organizational plaintiff must show an injury to their "core business activities." *Hippocratic Med.*, 602 U.S. 367, 395. Merely "spend[ing] a single dollar opposing those policies" a plaintiff disagrees with is insufficient. *Id.* Save Girls' Sports has done no more than oppose the policies, and as such, cannot establish standing on this theory.

However, Save Girls' Sports can establish associational standing. "An association has standing . . . on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members . . . ." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The only identifiable members of Save Girls' Sports who were injured in the context of Claims Four through Seven are T.S. and K.S.[9] [FAC ¶ 17]. *Satanic Temple v. Labrador*, __ F.4th __, 2025 WL 2302188, at *3–*4 (9th Cir. Aug. 11, 2025). Accordingly, as to Claims Four through Seven, Save Girls' Sports' standing is based upon and no broader than the standing of T.S. and K.S.[10]

Accordingly, the Court **DENIES** both motions to dismiss inasmuch as they attempt to argue Plaintiffs lack standing to seek monetary relief. However, the Court **DISMISSES** Claims Four through Seven inasmuch as they request injunctive relief, but **GRANTS LEAVE TO AMEND** on those claims.

---

[9] Plaintiffs refer vaguely to other athletes who competed against M.L., but again, never identifies them as members of Save Girls' Sports. [FAC ¶¶ 150–151]

[10] While prudential standing concerns may counsel against associational standing where "the organization only [seeks] to represent the only one or two individuals who were plaintiffs as well," no party raises this issue in their motions. *Nat'l Fed'n of the Blind of California v. Uber Techs., Inc.*, 103 F. Supp. 3d 1073, 1080 (N.D. Cal. 2015). If Save Girls' Sports fails to articulate an interest different from, or explain why the individual plaintiffs are unable to prosecute their claims, the Court may be inclined to revisit its standing holding as to Claims Four through Seven (there is no challenge as to Save Girls' Sports standing as to the other claims).

### B. Proper Defendants

The Court agrees with the State Defendants that Plaintiffs have not shown the Attorney General is properly named in this action as to their claims regarding AB 1266.  On the Court's reading, it is entirely unclear how the Attorney General enforces AB 1266.  For example, Plaintiffs state that Rob Bonta is "authorized to enforce California law."  [FAC ¶ 24].  But something more than a "generalized duty to enforce state law" is required under *Ex parte Young*.  *Snoeck v. Brussa*, 153 F.3d 984, 986 (9th Cir. 1998).  The standard is not exacting, "*Ex parte Young* demands merely that the implicated state official have a relevant role that goes beyond 'a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision.'"  *Mecinas v. Hobbs*, 30 F.4th 890, 903–04 (9th Cir. 2022) (quoting *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004)).

Additionally, Plaintiffs fail to allege that State Defendants are recipients of federal funding such that they are subject to Title IX.  This too is an independent reason to dismiss the State Defendants.

The Court, however, disagrees with the State Defendants' arguments that they cannot be sued in their official capacities.  Where a State's sovereign immunity has been waived, as is the case in a Title IX claim (assuming Plaintiffs allege State Defendants are recipients of federal funding), the leader of a state agency, sued in their official capacity, can be a proper defendant.  *Seven Up Pete Venture v. Schweitzer,* 523 F.3d 948, 952 (9th Cir. 2008)

Accordingly, the Court dismisses **CLAIMS FOUR THROUGH SEVEN** as against the State Defendants **WITH LEAVE TO AMEND.**

### C. Title IX Claims

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  "The existence of a private right of action to enforce Title IX is well-established."  *Mansourian v. Regents of Univ. of California,* 602 F.3d 957, 964 n.6 (9th Cir. 2010).

As State Defendants point out, the nature of Plaintiffs' Title IX claims is often confusing.  The Court will explain as it evaluates each claim below, but in short, the Court sees Plaintiffs as attempting to combine two separate injuries into one.  First, Plaintiffs argue they were injured by AB 1266, which requires schools

allow transgender athletes to participate in sex-segregated sports in the sex of their choosing. Second, Plaintiffs argue that the School Defendants treated a transgender athlete, M.L., more favorably than cisgender athletes on the Luther King High School girls' cross-country team. The Court sees these claims as fundamentally distinct. In the first, Plaintiffs allege they are injured by AB 1266 and the participation of transgender athletes. In the second, Plaintiffs allege they were injured by School Defendants' alleged favoritism towards M.L., not the operation of AB 1266 or the mere fact of her participation. In future complaints, the Court instructs Plaintiffs to separate and clarify their claims (and distinguish between School and State Defendants whenever possible).[11]

### 1. Claim Four: Intentional Discrimination

Plaintiffs raise an intentional discrimination claim against all Defendants. The gist of Plaintiffs' claim is that Chann "treated M.L. more favorably than Plaintiffs because of M.L.'s gender identity." [FAC 291]. They allege that Chann promoted M.L. to the Varsity team despite her not meeting the requirements as laid out in the cross-country handbook, and that her promotion was "based on M.L.'s gender identity." [*Id.* 293, 295]. Additionally, they point out that Chann gave M.L. "one-on-one coaching and running alone with M.L., separate from the team" as well as other practice and academic accommodations that were not provided to cisgender girls. [FAC 296].

"Discrimination on the basis of sex can be defined as treating someone differently simply because that person's sex is different from a similarly situated person of the opposite sex." *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d 1151, 1161 (C.D. Cal. 2015); *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978) (applying the "simple test of whether the evidence shows treatment of a person in a manner which but for that person's sex would be different" (citation modified)). "[D]iscrimination on the basis of transgender status is a form of sex-based discrimination." *Hecox*, 104 F.4th at 1079.

Here, School Defendants point out that the academic and practice time accommodations were given for a non-discriminatory reason: M.L.'s plan to graduate early. That may be so, but Plaintiffs point to other conduct, such as Chann's individualized coaching that is not easily explained by M.L.'s early

---

[11] Because the Court addresses the clarity issues on a claim-by-claim basis, the Court **DENIES** School Defendants' Motion as under Rule 12(e).

graduation plans.  At this early stage, that is sufficient.  Accordingly, the Court **DENIES** the School Defendants' Motion to Dismiss as to Claim Four.

However, the Court dismisses the claim against the State Defendants.  The First Amended Complaint is entirely lacking in any explanation of how the State Defendants have intentionally discriminated against Plaintiffs.  Plaintiffs make the conclusory statement that "AB 1266 permits M.L., a biological male, to participate in female sports and use female spaces, thereby, violating the federal protections of Title IX."  [FAC ¶ 308].  To the extent that Plaintiffs are attempting to plead some type of facial or preemption-based challenge to AB 1266, they must do in a separate claim and cannot sneak it in with a few conclusory allegations at the end of a claim that spends the previous thirty paragraphs discussing an entirely different course of conduct (School Defendants' allegedly discriminatory treatment of the cisgender participants of the cross-country team).  [*See* CA MTD Reply at 4 n.6].  To the extent Plaintiffs are trying to argue that State Defendants somehow participated in or sanctioned Chann's allegedly favorable treatment of M.L., Plaintiffs' must explain how the passage of AB 1266 and State Defendants' actions specifically led to the conduct discussed in their complaint.

Accordingly, Claim Four as against the State Defendants is **DISMISSED WITH LEAVE TO AMEND.**

### a.  Claim Five: Effective Accommodation

While an intentional discrimination claim can arise in any educational context, Title IX and its regulations as applied to athletics require that funding recipients "provide equal athletic opportunity for members of both sexes."  34 C.F.R. § 106.41(c).  There are two types of claims relevant to athletic opportunity cases, effective accommodation and equal treatment.  "Effective accommodation claims . . . concern the opportunity to participate in athletics, while equal treatment claims allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics."  *Mansourian v. Regents of Univ. of California*, 602 F.3d 957 (9th Cir. 2010).

The Ninth Circuit has adopted a three-part test from Title IX's regulations to determine if an institution is complying with Title IX's effective accommodation requirement:

> (1) Whether . . . participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among . . . athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among . . . athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. 71,413, 71,418 (Dec. 11, 1979); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 854 (9th Cir. 2014). So long as an institution complies with "any one of the above conditions," it has complied with Title IX. *Ollier*, 768 F.3d at 854.

Here, Defendants argue that the first condition—substantial proportionality—is met at Martin Luther King High School. At the first step of the substantial proportionality analysis, we "begin[] with a determination of the number of participation opportunities afforded to male and female athletes," counting only "actual athletes, not unfilled spots." *Id.* at 855–56 (citation modified). Then we "consider whether the number of participation opportunities—*i.e.*, athletes—is substantially proportionate to each sex's enrollment." *Id.* at 856. At this stage, "[e]xact proportionality is not required." *Id.*; *Id.* at 857 n.10 (paraphrasing a Department of Education statement that "a 62–woman gap would likely preclude a finding of substantial proportionality, but that a six-woman gap would likely not").

There are simply not enough facts alleged in the complaint to suggest that the participation of a single transgender athlete at Martin Luther King, or anything else about the operation of AB 1266 has affected the substantial proportionality of participation opportunities available for female athletes at Martin Luther King High School or in the State. As such, Plaintiffs have failed to state an equal accommodation claim.

Plaintiffs pivot and argue there is a second requirement for effective accommodation claims, that the participation opportunities be of equal quality.

They cite to out-of-circuit authority holding that the "*quality* of competition provided" must be proportional and that athletic opportunities must "equally reflect" women's "abilities." *Roberts v. Colo. State Bd. of Ag.*, 998 F.2d 824, 829 (10th Cir. 1993) (emphasis added).

Plaintiffs misconstrue the relevant regulations and caselaw. While the Department of Education's regulations and guidance do discuss the "levels of competition," this has not been interpreted to set regulations as to the actual parameters of participation and competition. Instead, courts interpreting the levels of competition question refer to the nature of the advanced competitive opportunity, say for example, whether the school offers intramural instead of intercollegiate opportunities. Plaintiffs do not cite (and the Court is unaware of) any authority that holds that an effective accommodation claim creates an entitlement to particular rules of competition.

Accordingly, Claim Five is **DISMISSED WITH LEAVE TO AMEND.**

### b. Claim Six: Unequal Treatment

Next, Plaintiffs raise an unequal treatment claim. Equal treatment claims require "equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes." 44 Fed.Reg. 71,413, 71,417–418. "Compliance in the area of equal treatment and benefits is assessed based on an overall comparison of the male and female athletic programs, including an analysis of recruitment benefits, provision of equipment and supplies, scheduling of games and practices, availability of training facilities, opportunity to receive coaching, provision of locker rooms and other facilities and services, and publicity." *Ollier v. Sweetwater Union High Sch. Dist.*, 858 F. Supp. 2d 1093, 1110 (S.D. Cal. 2012), *aff'd*, 768 F.3d 843 (9th Cir. 2014) (citing 34 C.F.R. 106.41(c)).

Plaintiffs make only a short argument in opposition – arguing that Defendants are allowing transgender girls "to take rankings, podium finishes, recognition from female athletes." [State MTD Opp'n at 20]. But Plaintiffs make no attempt to explain how a Title IX equal treatment claim is fit for purpose here. An equal treatment claim analyzes benefits available to sex-segregated teams, and the appropriate comparison is between male and female. But Plaintiffs' only comparison between the teams is not one of the provision of "athletic benefits" available to male and female athletes, but a vague argument that cisgender girls are entitled to certain rules of competition. Plaintiffs must make a specific showing why a Title IX equal treatment claim is appropriate in this case.

In short, Plaintiffs' Claim Six is **DISMISSED WITH LEAVE TO AMEND.**

### c. Notice, Conflicts, and Preemption

As discussed above, the Court dismisses the Title IX claims, and so does not reach the issue of notice under *Pennhurst*. The Court does agree with State Defendants and the Ninth Circuit that where an athletics policy is at issue, the relevant question of notice is whether the state received notice from Congress that the allegedly conflicting condition of its funding was unambiguously imposed on the state, so as for the state to validly waive its sovereign immunity when it accepted the federal funding. *Doe*, 115 F.4th at 1110–11. While there may be other cases where the notice issue is whether the school received notice of the Title IX violation, that is not this case.

 If Defendants plan to raise notice as a defense in future motions, the Court would appreciate additional analysis on what weight to give Title IX's implementing regulations in light of *Loper Bright* and subsequent caselaw interpreting *Loper Bright*. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024); *see also Lopez v. Garland*, 116 F.4th 1032 (9th Cir. 2024). Additionally, the Court would appreciate argument as to whether notice can be decided as a freestanding issue before it reaches the merits of the Title IX claims. *Roe v. Critchfield*, 137 F.4th 912, 928 (9th Cir. 2025) (reaching notice issue without reaching merits in context of preliminary injunction); *see also Soule*, 90 F.4th at 53.

### D. Claim Seven: State-Law Discrimination

Plaintiffs voluntarily dismiss this claim against State Defendants. [CA MTD Opp'n at 15 n.4].

As to the School Defendants, under § 220, "[n]o person shall be subjected to discrimination on the basis of disability, gender, gender identity, gender expression, nationality, race or ethnicity, religion, sexual orientation, or any other [protected] characteristic . . . in any program or activity conducted by an educational institution that receives, or benefits from, state financial assistance, or enrolls pupils who receive state student financial aid." Cal. Educ. Code § 220.

The Court dismisses the School Defendants as immune or outside the scope of the cause of action. School districts (and the named defendants as sued in their official capacities) enjoy sovereign immunity from suits under state law in federal court. *T.L. v. Orange Unified Sch. Dist.*, No. 823CV01078, 2024 WL 305387, at

*9 (C.D. Cal. Jan. 9, 2024); *see also Stoner v. Santa Clara Cnty. Off. of Educ.*, 502 F.3d 1116, 1122 (9th Cir. 2007) (holding "California school district" is an "arm[] of the state for purposes of Eleventh Amendment sovereign immunity").

As to the named defendants as sued in their personal capacities, they are not proper defendants, as they are not the recipients of state financial aid.

In future complaints, Plaintiffs must explain how the School Defendants have waived their sovereign immunity, or otherwise can be properly sued, to proceed any further on this claim.

Accordingly, the Court **DISMISSES** Claim Seven **WITH LEAVE TO AMEND** as to the School Defendants. The Claim is **DISMISSED** as to the State Defendants **WITHOUT LEAVE TO AMEND** but **WITHOUT PREJUDICE** to refiling in State Court.

## IV.    CONCLUSION

At this juncture, most of Plaintiffs' First Amended Complaint does not fully state a claim upon which relief can be granted. For the reasons stated above, however, the Court finds that amendment would not be futile. As such, the Court **GRANTS IN PART** and **DENIES IN PART** the School Defendants' Motion to Dismiss and **GRANTS** the State Defendants' Motion to Dismiss.

The Court:

- **DENIES** the School Defendants' Motion as to Claim Four;

- **DISMISSES** Claims Five, Six, and Seven as to the School Defendants **WITH LEAVE TO AMEND**;

- **DISMISSES** Claims Four, Five, and Six as against the State Defendants **WITH LEAVE TO AMEND;** and

- **DISMISSES** Claim Seven as against the State Defendants **WITHOUT LEAVE TO AMEND** and **WITHOUT PREJUDICE** to refiling in state court.

Should any amended complaint be necessary, Plaintiffs are hereby **ORDERED** to file a consolidated amended complaint no later than **October 15, 2025**. Any amended complaint **SHALL ONLY** address the deficiencies identified

herein.  Plaintiffs are further instructed to include as an exhibit a redlined version
of the amended complaint reflecting all changes made.  Failure to comply with this
order could result in sanctions including dismissal of the action with prejudice.

**IT IS SO ORDERED.**