ADVOCATES FOR FAITH & FREEDOM
Robert H. Tyler (SBN 179572)
btyler@faith-freedom.com
Julianne Fleischer (SBN 337006)
jfleischer@faith-freedom.com
25026 Las Brisas Road
Murrieta, California 92562
Telephone: (951) 304-7583

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAVE GIRLS' SPORTS, an unincorporated California association; T.S., a minor by and through her father and natural guardian, RYAN STARLING, individually, and on behalf of all others similarly situated; and K.S., a minor by and through her father and mother and natural guardians, DANIEL SLAVIN and CYNTHIA SLAVIN, individually, and on behalf of all others similarly situated;<br><br>Plaintiff(s)<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF EDUCATION; RIVERSIDE UNIFIED SCHOOL DISTRICT; LEANN IACUONE, Principal of Martin Luther King High School, in her personal and official capacity; and AMANDA CHANN, Assistant Principal and Athletic Director of Martin Luther King High School, in her personal and official capacity;<br><br>Defendant(s). | Case No.:  5:24-cv-02480 SSS (SPx)<br><br>**VERIFIED SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES:**<br><br>1) **DEPRIVATION OF THE FREEDOM OF SPEECH – FACIAL**<br>2) **DEPRIVATION OF THE FREEDOM OF SPEECH – AS APPLIED**<br>3) **VIOLATION OF THE DUE PROCESS CLAUSE**<br>4) **VIOLATION OF TITLE IX – SEX DISCRIMINATION**<br>5) **VIOLATION OF TITLE IX – EFFECTIVE ACCOMMODATION**<br>6) **VIOLATION OF TITLE IX – EQUAL TREATMENT**<br>7) **VIOLATION OF TITLE IX – FACIAL**<br>8) **VIOLATION OF TITLE IX – AS APPLIED**<br><br>**DEMAND FOR JURY TRIAL** |

1

**INTRODUCTION**

1.    This lawsuit challenges the State of California's clear efforts to undermine federal protections for women under Title IX, the Riverside Unified School District's ("District" or "RUSD") violations of Title IX, and the District's unlawful censorship of viewpoints it disfavors.

2.    AB 1266, codified in the California Education Code, requires that a student must be "permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on the pupil's records." *See* Cal. Educ. Code § 221.5(f).

3.    Title IX is a federal civil rights law that exists to ensure equal educational opportunities and prevent discrimination based on sex in federally funded schools and programs.

4.    AB 1266 directly conflicts with Title IX protections, as it requires California schools to permit biological males[1] to participate on biological female sports teams and to use biological female spaces, resulting in unfair and unsafe environments for females.

5.    AB 1266 is harming hundreds – if not thousands – of female students by removing opportunities for female athletes to be champions in their own sports, robbing them of podium positions and awards, and creating unsafe and intimidating environments in their bathrooms and locker rooms.

6.    Plaintiffs, K.S., a ninth-grade female cross-country athlete, and T.S., an eleventh-grade female cross-country athlete and team captain, at Martin Luther King High School ("MLKHS") in the District, and Save Girls' Sports, an unincorporated California association consisting of California students and parents, contend that California's AB 1266 and subsequently,

---

[1] "Male," "Female, "Boy," and "Girl" used in this Complaint refer solely to binary, biological sex and not a person's "gender identity." *See Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (Title IX defines "sex" "based on biology and reproductive function."); Black's Law Dictionary (5th ed. 1979) ("**Sex**. The sum of the peculiarities of structure and function that distinguish a male from a female organism[.]"); *see also Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 655 (2020) ("Sex" in the Civil Rights Act of 1964 "refer[s] only to biological distinctions between male and female"); *see also* Executive Order No. 14168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (2025) ("'Sex' shall refer to an individual's immutable biological classification as either male or female. 'Sex' is not a synonym for and does not include the concept of 'gender identity.'").

VERIFIED SECOND AMENDED COMPLAINT

the District's policies and practices deny them fair and equal access to athletic opportunities in violation of Title IX.

7.    Plaintiffs K.S. and T.S. also content that the District's policies and practices unfairly restrict their freedom of expression.

8.    T.S. was ousted from her position on the girls' varsity cross-country team to make room for a biological male athlete who did not consistently attend practices and failed to satisfy many of the team's varsity eligibility qualifications.

9.    As a result, T.S. missed the opportunity to compete at a high-profile meet, losing the right to compete on the varsity level and missing the opportunity to be exposed to the elite competitors for purposes of college recruitment and recognition.

10.    The biological male athlete who displaced T.S. on the girls' varsity team had recently transferred from another local high school after breaking that school's all-time cross-country record for the girls' cross-country team.

11.    Following T.S.'s removal from her position on the varsity cross-country team, T.S. and K.S. wore shirts bearing the messages "Save Girls' Sports" and "It's Common Sense. XX ≠ XY." School officials ordered K.S. and T.S. to remove or conceal the shirts, claiming the messages created a "hostile" environment.

12.    Defendants Amanda Chann and Leann Iacuone claimed the messages on Plaintiffs' shirts created the same level of hostility as a student wearing a swastika in front of Jewish students.

13.    Following the District's initial censorship of K.S. and T.S.'s speech, approximately 150+ Save Girls' Sports members and others, wore shirts in support of K.S. and T.S. to school bearing various messages, including "Save Girls' Sports," "It's Common Sense. XX ≠ XY," and "It's Not Right. It's Not Fair."

14.    The District directed staff to report any students wearing "Save Girls' Sports" shirts on campus-to-campus administrators wherein campus administrators detained students for hours, preventing them from receiving instructional time, and then directing students to remove or cover their "Save Girls' Sports" shirts. Many of those same students are members of Plaintiff Save Girls' Sports.

VERIFIED SECOND AMENDED COMPLAINT

15. Despite not allowing Plaintiffs' desired messaging on campus, MLKHS allows other political and social messages to be displayed across campus.

16. This Action seeks to affirm Plaintiffs' right to express their views, ensure fair athletic opportunities for female students, and hold the State of California and the District accountable for discriminatory policies and practices.

**PARTIES - PLAINTIFFS**

17. Plaintiff Save Girls' Sports ("SGS") is a California unincorporated association comprised of students and parents in California who are subject to state and local policies that discriminate based upon biological sex. SGS students' rights have been relegated as second-class due to laws and policies that diminish, and in some cases, revoke their federal rights. Save Girls' Sports exists to advocate for, protect, and enhance opportunities for girls in sports at all levels. Save Girls' Sports is dedicated to ensuring that girls have equal access to athletic opportunities, resources, and recognition, fostering an environment where they can thrive physically, socially, and mentally. By raising awareness and supporting policy change, Save Girls' Sports strives to combat gender inequality in sports, ensuring that every girl has the chance to participate, compete, and excel. Through its efforts, Save Girls' Sports aims to empower young girls and break down barriers that hinder their athletic growth and success. Save Girls' Sports has a current and continued presence through its student members throughout California schools. These students are members of the Save Girls' Sports and have been and continue to be subject to discrimination described herein. Members of SGS included students T.S. and K.S. Other student members include numerous female student athletes at Martin Luther King High School, as well as those from other high schools within the Riverside Unified School District and from various school districts across California.

18. Plaintiff K.S., a minor, is a ninth-grade female student athlete at Martin Luther King High School and, at all times relevant to this Complaint, a resident of Riverside County, California.

19. Plaintiff T.S., a minor, is an eleventh-grade female student athlete at Martin Luther King High School and, at all times relevant to this Complaint, a resident of Riverside County, California.

20.     Plaintiff RYAN STARLING is T.S.'s father and natural guardian. At all times relevant to this Complaint, Ryan is a resident of Riverside County, California.

21.     Plaintiff DANIEL SLAVIN is K.S.'s father and natural guardian. At all times relevant to this Complaint, Daniel is a resident of Riverside County, California.

22.     Plaintiff CYNTHIA SLAVIN is K.S.'s mother and natural guardian. At all times relevant to this Complaint, Cynthia is a resident of Riverside County, California.

**PARTIES - DEFENDANTS**

23.     Defendant California Department of Education ("CDE") is a current and past recipient of federal funding. CDE distributes federal funding to public and private local schools, including to schools participating in interscholastic athletics within the Central District of California.

24.      Defendant CDE, under the California Education Code, has authority over the interscholastic athletic policies of local school districts, including RUSD. Cal. Educ. Code § 33354(a)(1).

25.     Defendant RIVERSIDE UNIFIED SCHOOL DISTRICT is a school district in Riverside County, California. Defendant RUSD is responsible for the adoption and implementation of District policies and ensuring its agents enforce District policies.

26.     Defendant LEANN IACUONE is the Principal of Martin Luther King High School. Under District policy, she is responsible for implementing and enforcing District policies related to student speech and student athletics, and she has discretion in the implementation of said policies on an individualized basis. Defendant Iacuone enforced District policy against K.S. and T.S. when she prohibited K.S. and T.S. and other members of SGS from wearing the shirt with the message "Save Girls' Sports" and "It's Common Sense. XX ≠ XY" on it. Defendant Iacuone also perpetuated the analogy that wearing the "Save Girls' Sports" shirts is analogous to a student wearing a swastika in front of a Jewish student. She is sued in both her individual and official capacity.

27.     Defendant AMANDA CHANN is the Assistant Principal and Athletic Director of Martin Luther King High School. Under District policy, she is given discretion to implement and enforce District policies related to student speech and student athletics. Defendant Chann also

compared the wearing of the "Save Girls' Sports" shirts to a student wearing a swastika in front of a Jewish student. Defendant Chann enforced District policy against K.S., T.S., and other members of SGS when she prohibited them from wearing the shirt with the message "Save Girls' Sports" and "It's Common Sense. XX ≠ XY" on it. Defendant Chann also made the decision to place the male transgender student athlete on the girls' varsity team and remove T.S. from the girls' varsity team. Defendant Chann is sued in both her individual and official capacity.

28. All Defendants are responsible for the implementation and application of federal law, state law, and District policies.

## JURISDICTION AND VENUE

29. This civil rights action raises federal questions under the United States Constitution, specifically the First and Fourteenth Amendments, and under federal law, particularly 42 U.S.C. § 1983 and Title IX.

30. This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

31. This Court has authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, implemented through Rule 57 of the Federal Rules of Civil Procedure. This Court is also authorized to grant injunctive relief and damages under 28 U.S.C. § 1343, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

32. This Court has authority to award costs, attorneys' fees and expert witness fees under 42 U.S.C. § 1988(b) and (c).

33. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## STATEMENT OF FACTS

### A. SCOPE OF TITLE IX

34. In 1972, Congress enacted Title IX, 20 U.S.C. § 1681, which forbids education programs or activities receiving federal financial assistance from discriminating against persons based on their sex.

35.    Section 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

36.    Title IX was enacted as a response to the passage of Title VII of the Civil Rights Act of 1964 to shore up protections for women. House Report No. 92-554, p. 51–52. Specifically, while Title VII prohibited employers from discriminating based on sex, it exempted educational institutions from its terms. *Id*.

37.    In the hearings that proceeded the enactment of Title IX, discrimination against women in admissions to college and against women in faculty were of primary focus. *See* 116 Cong. Rec. 6398–6400; 116 Cong. Rec. 22,681–82; 117 Cong. Rec. 22,735–43. For instance, at the University of North Carolina, admission for women was "restricted to those who are especially well qualified," while no such restriction existed for men. And, at the faculty level, women were disproportionately not hired, and where they were hired, women disproportionately held lower-level jobs, were given fewer promotions, and paid less than men. *Id*. at 51.

38.    In the hearings on equal rights, Dr. Bernice Sandler called for protections for women in education because, "Sex prejudice is so ingrained in our society that many who practice it are simply unaware that they are hurting women. Let me reiterate, –it is the last socially acceptable prejudice." Hearings, Ninety-first Congress, second session, on S.J. Res. 61, May 5, 6, and 7, 1970, p. 415.

39.    Birch Bayh, the Chief Senate sponsor of what would become Title IX, stated, "The bill I am submitting today will guarantee that women, too, enjoy the educational opportunity every American deserves."  117 Cong. Rec. 32,476-79. He further stated the bill was "an important first step in the effort to provide for the women of America something that is rightfully theirs – an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work." 118 Cong. Record 5808 (1972).

40.    Senator Bayh further stressed that Title IX "provide[d] equal access to women and men" but did not "desegregate" spaces and activities that have long been sex-separated. 117 Cong. Rec. 30407 (1971). Senator Bayh recognized that regulations would be necessary to "allow enforcing agencies to permit differential treatment by sex only, . . . such as . . . in sports facilities or other instances where personal privacy must be preserved." 118 Cong. Rec. 5807.

41.    Title IX does have exemptions that allow for traditionally male-only and female-only activities, so long as similar opportunities are permitted for the opposite sex. *See* 20 U.S.C § 1681(a)(1)–(8).

42.    As a whole, biological males have physiological advantages over biological females. *See Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("The record makes clear that due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team."); *Cape v. Tennessee Secondary School Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (overturned on other grounds) ("It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement.").

43.    Scientific research also demonstrates that biological males have numerous physiological advantages. While these advantages are greatest after puberty, they begin at birth. *See, e.g.*, Frank Falkner, J.M. Tanner, Human Growth: Postnatal Growth, p. 286 (1976) ("Boys demonstrate, on the average, greater strength than girls at all ages.").

44.    From its inception, there was no question that Title IX was meant only to protect biological females, as its protections were meant for the "over 50 percent of our population" that was female for which there was no effective protection in the educational field. 117 Cong. Rec. 32,476-79.

45.    Furthermore, at the time of Title IX's enactment, the dictionary definitions of "sex" demonstrate that Congress meant *biological* sex when it prohibited discrimination on the basis of "sex" in education. *See Adams v. Sch. Bd. of St. Johns Cty.*, 58 F.4th 791 (2022) (citing Sex, American Heritage Dictionary of the English Language (1976) ("The property or quality by

8

which organisms are classified according to their reproductive functions."); Sex, American Heritage Dictionary of the English Language (1979) (same); Sex, Female, Male, Oxford English Dictionary (re-issue ed. 1978) (defining "sex" as "[e]ither of the two divisions of organic beings distinguished as male and female respectively," "female" as "[b]elonging to the sex which bears offspring," and "male" as "[o]f or belonging to the sex which begets offspring, or performs the fecundating function of generation"); Sex, Webster's New World Dictionary (1972) ("[E]ither of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions."); Sex, Female, Male, Webster's Seventh New Collegiate Dictionary (1969) (defining "sex" as "either of two divisions of organisms distinguished respectively as male or female," "female" as "an individual that bears young or produces eggs as distinguished from one that begets young," and "male" as "of, relating to, or being the sex that begets young by performing the fertilizing function"); Sex, Random House College Dictionary (rev. ed. 1980) ("[E]ither the male or female division of a species, esp. as differentiated with reference to the reproductive functions.").

46.    Title IX was designed to eliminate significant "discrimination against women in education." *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 766 (9th Cir. 1999).

47.    Title IX was enacted to ensure that biological women received "equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." *See United States v. Virginia*, 518 U.S. 515, 532 (1996).

48.    The Department of Health, Education and Welfare (the predecessor to the Department of Education) issued regulations for Title IX that took effect in 1975. *See* 34 C.F.R. § 106.1.

49.    These regulations required that, if an entity subject to Title IX provides athletic programs or opportunities separated by sex, then it must do so in a manner that "provide[s] equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).

50.    Equal athletic opportunity can be determined by whether such athletic opportunities "effectively accommodate the interests and abilities of both sexes." 34 C.F.R. § 106.41(c).

51.    Here, the "governing principle" is that "the athletic interests and abilities of male and female students must be equally effectively accommodated." Policy Interpretation, 44 Fed. Reg.

71,413, 71,414 (1979).

52. More specifically, the District must accommodate the physical abilities of girls "to the extent necessary to provide equal opportunity in . . . levels of competition," and competitive opportunities "which equally reflect their abilities." Policy Interpretation, 44 Fed. Reg. at 71,417-418.

53. As another aspect of equal athletic opportunity, implementing regulations and guidance state that male and female athletes "should receive equivalent treatment, benefits and opportunities." Policy Interpretation, 44 Fed. Reg. at 71,415.

54. The "equal treatment" to which girls are entitled includes equal "opportunities to engage in . . . post-season competition," *id.* at 71,416, equal opportunities for public recognition, 34 C.F.R. § 106.41(c), and the right to be free of any policies which are "discriminatory in . . . effect" or that have the effect of denying "equality of athletic opportunity." 44 Fed. Reg. at 71,417.

55. An institution is only in compliance "if the compared program components are equivalent, that is, equal or equal in effect." *Id.* at 71,415.

56. Accordingly, Title IX is understood to require the allocation of equal opportunities based on biological sex alone without regard to or consideration of gender identity. When an institution creates a team for one sex, "it must do so for members of the other sex" given certain conditions are met. *Id.*

57. In 2024, the Biden administration issued provisions aimed at expanding Title IX. The new regulations stated that Title IX forbids discrimination based on sexual orientation or gender identity.

58. On January 9, 2025, a federal judge invalidated the Biden administration's regulations citing several legal flaws, including that the Education Department exceeded its authority by expanding the scope of Title IX. *Tennessee v. Cardona*, No. CV 2:24-072-DCR, 2025 WL 63795 (E.D. Ky. Jan. 9, 2025), as amended (Jan. 10, 2025).

59. On January 20, 2025, President Donald Trump issued an Executive Order "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." *See* Executive Order 14168 (2025) ("EO").

60.     The EO recognized that "ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women." *Id.*

61.     The EO states that it "is the policy of the United Staes to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality." *Id.*  Under the EO, the "executive Branch will enforce all sex-protective laws to promote this reality." *Id.*

62.     Pursuant to EO, the provided definitions for "sex," "women," "men," "female," and "male" "shall govern all Executive interpretation of and application of Federal law and administration of policy." *Id.*

63.     Specifically, "sex" "shall refer to an individual's immutable biological classification as either male or female. 'Sex' is not a synonym for and does not include the concept of 'gender identity.'" *Id.*

64.     The EO further recognizes that "gender identity" "reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." *Id.*

65.     Pursuant to EO, "[e]ach agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes." *Id.*

66.     Further, the EO states that "[f]ederal funds shall not be used to promote gender ideology." *Id.*

67.     The EO reinstates the federal protections for women under Title IX that previous administrations have attempted to remove.

68.     Title IX may be enforced by a private right of action. *Cannon v. University of Chicago*, 441 U.S. 677 (1979). "[A] damages remedy is available for an action brought to enforce Title IX." *Franklin v. Gwinnet County Public Schools*, 503 U.S. 60, 76 (1992).

69.     On information and belief, all public schools in California, including Martin Luther King High School, receive federal funds covered by Title IX, and thus are subject to the requirements of Title IX.

**B.      SCOPE OF AB 1266**

70.     In 1976, the California legislature enacted California Education Code section 221.5, which prohibits elementary and secondary schools from discriminating against students based on their *sex* in both academic and non-academic courses.

71.     Section 221.5 was amended a couple times before Tom Ammiano (D), a member of the California State Assembly from 2008-2014, introduced AB 1266 in 2013. After the bill passed both the Assembly and the Senate in summer 2013, Governor Brown signed it into law in August 2013, and AB 1266 became effective on January 1, 2014.

72.     Upon amendment, California Education Code section 221.5(f) (or AB 1266) provides, "a pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her *gender identity*, irrespective of the gender listed on the pupil's records." (emphasis added).

73.     The primary goal of AB 1266 was to "take away [] discretion from local school districts and create a uniform policy for participation in sports." Assembly Comm. on Educ. AB 1266, p. 2 (2013).

74.     The further purpose, according to the primary author of the bill, was to provide school districts with a method for dealing with transgender students playing sports in schools. Ammiano reasoned:

> [M]any school districts do not understand and are not presently in compliance with their obligations to treat transgender students the same as all other students in the specific areas addressed by this bill. As a result, some school districts are excluding transgender students from sex-segregated programs, activities and facilities. Other school districts struggle to deal with these issues on an ad hoc basis. Current law is deficient in that it does not provide specific guidance about how to apply the mandate of non-discrimination in sex-segregated programs, activities and facilities.

Senate Comm. on Educ., AB 1266, p. 4 (2013).

75.     Ammiano reasoned that AB 1266 was necessary because:

> When transgender students are denied the opportunity to participate in physical education classes in a manner consistent with their gender identity, they miss out on these important benefits and suffer from stigmatization and isolation. In addition, in many cases, students who are transgender are unable to get the credits they need to graduate on time when, for example, they do not have a place to get ready for gym class.

Assembly Comm. on Educ. AB 1266, p. 3 (2013).

76.    The Assembly Committee on Education, referencing an Amicus Brief written by Jack O'Connell of the National Center for Lesbian Rights, Equality California, and Gay-Straight Alliance, cited O'Connell's reasoning that "a non-discriminatory policy permitting transgender students to use facilities that correspond to their consistently expressed gender identity would have little or no effect on the privacy interests of other students because schools can easily provide reasonable accommodations to balance the privacy interests of all students." *Id.* at 2.

77.    The CDE, a federal aid recipient, develops and publishes official interpretations, frequently asked questions (FAQs), and best practices to help local educational agencies (LEAs, such as school districts and charter schools) implement laws like AB 1266.

78.    Through its complaint resolution processes, the CDE investigates reports of violations of AB 1266. If a school violates AB 1266 – such as by denying a transgender student access to facilities or programs – the CDE can receive uniform complaints, conduct investigations, and require corrective actions. Non-compliance may lead to recommendations for policy changes or referrals to other state agencies.

## C.    PLAINTIFFS' BACKGROUND

79.    K.S. and T.S. are fifteen and sixteen years old respectively. Both are currently enrolled at Martin Luther King High School ("MLKHS") in the Riverside Unified School District ("District" or "RUSD").

80.    K.S. and T.S. are dedicated and skilled female student athletes at MLKHS.

81.    As a current freshman, K.S. is in her first cross-country season at MLKHS. She is currently on the girls' Junior Varsity Team, consistently ranking between second and third on the Junior Varsity Team.

82.     While attending Frank Augustus Miller Middle School in the District, K.S. participated in the girls' cross-country, track and field, volleyball, basketball, and soccer teams.

83.     While at Frank Augustus Miller Middle School, in both seventh and eighth grade, K.S. was the District champion in cross-country and the District champion across multiple events in track and field.

84.     In seventh grade, her middle school girls' soccer team won district champions, and her girls' volleyball and basketball teams came in second place. In eighth grade, her middle school girls' soccer, volleyball, and basketball teams won district champions.

85.     As a current junior, T.S. is in her third cross-county season at MLKHS.

86.     In 2023, T.S. received the MLKHS Most Improved Award for Cross Country, and in 2024, T.S. received the "Athlete of the Meet" after establishing a new personal record at the 45th Asics Clovis Invitational.

87.     In 2024, T.S. and the MLKHS girls' cross-country team placed second at both the Inland Empire Challenge and at the Big VIII League Finals.

88.     Since August 2024, T.S. has served as the MLKHS girls' cross-country Team Captain. In this leadership role, T.S. is responsible for demonstrating a strong work ethic, upholding a high standard of responsibility, and fostering a positive attitude to inspire and motivate the team.

89.     In August 2024, T.S. earned a position on the girls' Varsity Top 7 on MLKHS's cross-country team.

90.     Since the start of the cross-country season in August 2024, K.S. and T.S. have attended every MLKHS cross-country practice.

91.     Both K.S. and T.S. have dedicated numerous hours each week to cross-country practices and races, all while managing their heavy academic workloads and other scholastic activities. Each week, they participate in practices, diligently training and conditioning to be better athletes.

92.     Both K.S. and T.S. and their families have dedicated significant money, time, and energy to their personal success and the success of the MLKHS girls' cross-country team.

VERIFIED SECOND AMENDED COMPLAINT

**D.    MLKHS CROSS-COUNTY STUDENT-ATHLETE QUALIFICATIONS**

93.    Pursuant to Board Policy 6145.2, Defendants Iacuone and Chann, as District administrators, are responsible for site-level decisions over MLKHS athletic activities.

94.    MLKHS provides athletic programs or opportunities separated by sex.

95.    MLKHS has four separate cross-country teams, including boys' varsity and junior varsity teams and girls' varsity and junior varsity teams.

96.    The MLKHS boys' and girls' cross-country teams are highly competitive in the California Interscholastic Federation ("CIF"), Division 1. The MLKHS boys' cross-county team is ranked 5th in the State of California and the MLKHS girls' cross-country team is ranked 7th in the CIF Southern Section, Division 1.

97.    Given the times run by the boys' varsity and JV teams, if the teams were integrated the girls would not be selected for the team or reasonably be expected to actively compete in such a team if selected.

98.    In order to qualify for the girls' Junior Varsity team, MLKHS student athletes must consistently demonstrate a strong work ethic in practice and a positive effort during meets.

99.    According to the 2024 MLKHS Cross Country Team Handbook ("Handbook"), the girls' Varsity Top 7 lineup is typically left to the coaching staff's discretion based on the following criteria: (1) previous race times, (2) practice attendance, (3) "'varsity-level effort' at practice during the week (or specifically a lack of it), (4) attitude, (5) long-term team strategy by the coaching staff, (6) illness/injury, (7) varsity "exposure," and (8) other unforeseen issues. A true and correct copy of the 2024 MLKHS Cross Country Team Handbook is attached as **Exhibit 1**, p. 7.

100.    The Handbook also states, "Athletes are only allowed one excused missed workout without potential consequences." *Id.*, p. 6.

101.    "Upon the second missed workout, even with prior notification, participation in the next race is by coaches' discretion, but will usually result in missing the race." *Id.*

102.    The Handbook states that "[o]nly a doctor's note specifically mandating 'do not run' will be fully excused with no consequences to Letter Points or racing." *Id.*

103. According to the Handbook, "[t]he coaching staff will require all juniors and seniors to be fully vested in the cross-country program and 100% of its requirements." *See id.*, p. 3.

104. Each MLKHS cross-country student athlete and their parent or guardian are required to sign the Handbook, acknowledging its requirements.

105. The MLKHS girls' cross-country team generally practices Tuesdays and Thursdays from 6:30 A.M. to 7:45 A.M. (Varsity Only), Monday through Friday from 2:10 P.M. to 4:45 P.M. (Varsity and Junior Varsity), and Saturdays from 7:00 A.M. to 9:00 A.M. (Varsity and Junior Varsity).

106. Given its ranking, the MLKHS girls' Varsity Top 7 is regularly invited to the annual Mt. SAC Cross Country Invitational ("Mt. SAC Invitational"). The Team Sweepstakes Races are reserved for schools with exceptionally strong teams. Typically, schools ranked in the top ten in the State or the top ten in the California Southern Section request to be placed in the Mt. SAC Invitational Team Sweepstakes Race.

107. The Mt. SAC Invitational is a premier cross-country event in which qualifying teams from around the country participate and compete in. The Mt. SAC Invitational is also the host of the California Interscholastic Federation ("CIF") in Southern California.

108. This year, the 76th Annual Mt. SAC Invitational was held on October 25, 2024, and October 26, 2024.

109. The 76th Annual Mt. SAC Invitational was presented by Nike, and a live webcast of the High School division was broadcasted by RunnerSpace+ showcasing the best cross-country runners from around the state and country.

110. College scouts can attend the Mt. SAC Invitational in person or watch digitally to observe participating high schools and athletes.

111. College coaches often attend the Mt. SAC Invitational to scout and recruit prospective collegiate athletes.

112. With the passage of H.R. 850, a college athlete may make money based on their name, image, or likeness, making an opportunity to participate in collegiate athletics more lucrative and sought after than ever.

## E.    IN VIOLATION OF TITLE IX, DEFENDANTS ALLOW BIOLOGICAL MALES TO COMPETE ON GIRLS' SPORTS TEAMS

113.    MLKHS's girls' cross-country Varsity Top 7 list is updated before every meet. The varsity team may change from week to week depending on the qualifications set forth in the Handbook as referenced above. Pursuant to the Handbook, the discretion for determining the Varsity Top 7 is left to the coaching staff. *See* **Exhibit 1, p. 7.**

114.    For purposes of this Complaint, the transgender student is referred to as M.L. and is a biological male. [2]

115.    On or about October 19, 2024, after not attending any cross-country practices that week, M.L. competed, for the first time, at a varsity-level race with the MLKHS girls' cross-country team. M.L.'s time was 19:41.

116.    T.S. also competed at this same meet. Her time was 20:42.

117.    On or about October 22, 2024, approximately one week before the Mt. SAC Invitational, T.S. and her teammates received the updated girls' Varsity Top 7 list.

118.    T.S., who had held a position on the girls' Varsity Top 7 since August 2024 was removed from the girls' Varsity Top 7 to make room on the girls' Varsity Top 7 for M.L., an eleventh-grade transgender student. T.S. was relegated to the junior varsity team for one of the most important meets of the season for college recruitment.

119.    M.L. transferred from another Riverside Unified School District high school to MLKHS on or about June 2024.

120.    At M.L.'s previous high school, M.L. ranked #1 on the girls' high school cross-country team.

121.    At M.L.'s previous high school, M.L. broke the previous school's existing girls' all-time cross-country record, a record that had not been broken since 2014.

---

[2] To protect the identity of the transgender student, alternative initials—M.L.—are used in place of the real name or initials of the student in this Complaint.

122.    The MLKHS varsity coach initially identified T.S. on the Varsity Top 7 list for the Mt. SAC Invitational. However, Defendant Chann intervened, modified the list, and placed M.L. on the Varsity Top 7 replacing T.S.

123.    Because M.L. displaced T.S. with the girls' Varsity Top 7, T.S. was no longer permitted to compete with the girls' Varsity Top 7 at the October 2024 Mt. SAC Invitational.

124.    As the athletic director and assistant-principal supervising the varsity coach, Defendant Chann exercised the authority provided to her by school district policy and by Defendant Iacuone when she removed T.S. and replaced her with M.L.

125.    Contrary to the varsity eligibility qualifications listed in the Handbook, M.L. did not regularly attend MLKHS cross-country practices.

126.    M.L. attended approximately 13 out of 74 cross-country practices between August 2024 and October 2024.

127.    When M.L. attended practices, M.L. would often only attend the last 50 to 60 minutes of the approximately two and a half hour-practice.

128.    When M.L. did attend practice, Defendant Chann would join M.L. for M.L.'s runs.

129.    Oddly, Defendant Chann and M.L. would run together, but separately from the other girls' cross-country team members. Defendant Chann was never designated as a coach or assistant coach. However, Defendant Chann inserted herself into the team by her authority as the athletic director and assistant principal when she began to attend practices with M.L. in October of 2024, something she had not done previous to her replacing T.S. for M.L. on the Varsity Top 7.

130.    T.S. attended every cross-country practice during the season and demonstrated a concerted effort to retain a position on the girls' Varsity Top 7.

131.    T.S. took summer school classes in order to make room in her schedule during the academic year so that she could attend 6th period MLKHS cross-country practices as is required to be on the varsity team.

132.    M.L's race time, alone, did not qualify M.L. for a position on the girls' Varsity Top 7 according to the Handbook.

133.    As a result of being placed on the Junior Varsity team, T.S. was no longer permitted to participate in the Mt. SAC Invitational as a varsity athlete in the Team Sweepstakes Race.

134.    As a result, T.S. lost the opportunity to compete at a high-profile meet, losing valuable chances for college recruitment and recognition.

135.    Because M.L. was placed on the girls' Varsity Top 7, M.L. competed at the Mt. SAC Invitational as a varsity athlete instead of T.S.

136.    K.S.'s high ranking on the girls' Junior Varsity Team places her as one of the immediate contenders for the Varsity Top 7 in the event the girls' Varsity Top 7 is short on athletes due to injury or illness of a varsity team member.

137.    K.S. attended all practices during the season and satisfies the other varsity eligibility requirements.

138.    Because M.L. was placed on the girls' Varsity Top 7, one of T.S.'s teammates, M.K.[3], an SGS member, forfeited her girls' Varsity Top 7 position at the Mt. SAC Invitational in a show of solidarity for T.S.

139.    Because Defendants did not apply equal standards when considering the girls' Varsity Top 7, Defendants treated M.L. more favorably than K.S., T.S., and the other female athletes who have consistently satisfied the varsity eligibility qualifications.

140.    On or about October 24, 2024, prior to the Mt. SAC Invitational, T.S.'s parents met with Defendant Chann, Defendant Iacuone, and the cross-country head coach regarding M.L.'s displacement of T.S. from the girls' Varsity Top 7.

141.    T.S.'s parents addressed the expectations listed in the Handbook. T.S.'s parents referenced the mandatory practice attendance and the varsity attitude requirements to place on the Varsity Top 7 position.

---

[3] To protect the identity of the female athlete, alternative initials—M.K.—are used in place of the real name or initials of the student in this Complaint.

142.    Immediately following this meeting, on the same day, T.S.'s mother filed a Title IX complaint with the District citing gender discrimination. A true and correct copy of this Title IX complaint is attached as **Exhibit 2**.

143.    In her complaint, T.S.'s mother told the District she believed T.S. was being discriminated against based on her choice of gender for a few reasons:

- She [T.S.] was told she MUST be in the 6th-period class, even though she does not need PE credits and had to take summer school in order to keep room in her schedule. The other athlete [M.L.] has not been required to be in the 6th-period class.

- My daughter [T.S.] attends ALL practices, even when injured, and stays until 4:30-4:45 every day. The other athlete [M.L.] is not required to attend 6th-period nor the time allotted after school for practice. This person [M.L.] gets to go home instead of coming to the part of practice they are free to attend outside of academic hours.

- This person [M.L.] has chosen to try and graduate a year early. We think that is a great accomplishment and a worthwhile goal to pursue; however, there are many instances of cisgender girls giving up their sport or missing out on competition (games/races) because they are not allotted the same rules as this transgender person, specifically not being mandated to attend practices. Cisgender girls would be required to attend as much of practice as they can or they would be excluded from competition, why is the standard being applied differently? King Administration has notified us that this person is making a CHOICE to graduate early, attending zero period, sixth period, and an outside class at night. The law intends to allow students who participate in sports to make up assignments, tests, etc. when missing for travel to away games, for example, and not be punished academically, or when a senior needs a class that is REQUIRED to graduate on time. In this case, it is being applied to get this person [M.L] ahead of everyone else. My daughter could've graduated early, but she is being held to the expectation that she MUST be at practice in order to compete. She is being treated unequally and disadvantageously.

- My cisgender daughter is held to the ALL policies in the team handbook yet this person [M.L] is not required to follow them. Again, why is my daughter being held to tougher standards in order to race?

- Varsity athletes are held to EVEN higher standards and requirements in order to be on Varsity. My daughter meets all these requirements, but she has been bumped down to JV now and this athlete [M.L.] has been moved up to Varsity, despite only meeting one requirement and not attending any practices. My daughter is a Team Captain and was an Athlete of the Meet in Clovis. My daughter has been a dedicated member on the Varsity team and now that rules are being changed for this person [M.L.], it has unfairly displaced my daughter because she is not transgender.

*Id.*

144.    On October 25, 2024, the Title IX coordinator for the District, Bethany Scott, informed T.S.'s mother that the District would begin a "formal investigation."

145.    Ms. Scott also informed T.S.'s mother that Defendant Chann had stated that T.S. would not be harmed by running with the Junior Varsity team at the Mt. SAC Invitational.

146.    T.S.'s mother informed Ms. Scott that T.S. would be harmed because she would miss out on the opportunity to be recognized by college scouts at the Mt. SAC invitational.

147.    On or about November 1, 2024, after T.S.'s mother followed up on two separate occasions regarding the Title IX complaint, the District informed T.S. that the Title IX complaint was being converted to a confidential personnel matter rather than a gender discrimination complaint because "[t]he allegations, even if true, would not support a finding of sex-based discrimination."

148.    M.L. was placed on the girls' Varsity Top 7 despite not regularly attending cross-country practices (as required by the Handbook), attending only a portion of the practices, or showing any effort to be a part of the girls' Varsity Top 7.

149.    On or about October 19, 2024, at the Inland Empire Challenge, the top 30 female athletes received medals. M.L. finished 6th place. As a result of M.L.'s placement in the top 30, M.L. pushed a biological female, out of the top 30. As a result, the biological female who finished 31st, did not receive a medal.

150.    On or around November 8, 2024, at the Big VII League Finals, the top 21 female athletes were awarded medals. M.L. finished in 4th place, which pushed B.E., a biological female, out of the top 21. Consequently, B.E., who placed 22nd, did not receive a medal.

151.    On or about December 17, 2024, M.L. received the "MLKHS Senior Girl" award for fastest runner due to M.L. having the fastest run time on the girls' cross-country team.  Had M.L. not been on the girls' cross-country team, the award would have gone to a biological female.

152.    During the 2024-2025 track and field season, Defendant RUSD and Defendant CDE also allowed M.L. to compete on the MLKHS girls' track and field team.

153.    For each placement M.L. earned in track and field, every female athlete who finished behind M.L. in that event was displaced.

154.    On February 8, 2025, at the Martin Luther King-Ramona-Arlington Time Trials, M.L. displaced Save Girls' Sports members A.S., R.M., and other female athletes in the Girls' 200-meter race.[4]

155.    M.L. placed 7th with a time of 29.02 seconds, while A.S. placed 11th with a time of 30.17 seconds and R.M. placed 19th with a time of 32.38.[5]

156.    On February 8, 2025, at the Martin Luther King-Ramona-Arlington Time Trials, M.L. displaced Save Girls' Sports member A.R. in the Women's Varsity 300m Hurdles.[6]

157.    M.L. placed 1st with a distance of 49.19, while A.R. placed 4th with a distance of 54.94.[7]

158.    On February 26, 2025, at the Vista Murrieta v. ML King, M.L. again displaced Save Girls' Sports member A.R. in the Women's Varsity 300m Hurdles, finishing 2nd while A.R. finished 4th.[8]

159.    On April 9, 2025, at the ML King v. Norco, M.L. again displaced Save Girls' Sports member A.R. in the Women's Varsity 100m Hurdles, finishing 1st while A.R. finished 6th.[9]

160.    On April 29, 2025, at the Big VIII League Championships, M.L. again displaced Save Girls' Sports member A.R. in the Women's Varsity 300m Hurdles, finishing 2nd while A.R. finished 7th.[10]

---

[4] 200m Results – 2025 Track & Field Meet, ATHLETIC.NET, https://www.athletic.net/TrackAndField/meet/583855/results/f/2/200m (last visited Oct. 23, 2025).

[5] *Id.*

[6] Womens Varsity 300m Hurdles Results – 2025 Track & Field Meet, ATHLETIC.NET, https://www.athletic.net/TrackAndField/meet/583855/results/f/2/300mh (last visited Oct. 23, 2025).

[7] *Id.*

[8] Womens Varsity 300m Hurdles Results – 2025 Track & Field Meet, ATHLETIC.NET, https://www.athletic.net/TrackAndField/meet/586067/results/f/1/300mh (last visited Oct. 23, 2025).

[9] Womens Varsity 100m Hurdles Results – 2025 Track & Field Meet, ATHLETIC.NET, https://www.athletic.net/TrackAndField/meet/586846/results/f/2/100mh (last visited Oct. 23, 2025).

[10] Womens VAR 300m Hurdles Results – 2025 Track & Field Meet, ATHLETIC.NET, https://www.athletic.net/TrackAndField/meet/608877/results/f/4/300mh (last visited Oct. 23, 2025).

161.    In total, M.L. participated in approximately twenty-seven different track and field events as a member of the MLKHS girls' track and field team during the 2024-2025 season, displacing many female athletes, including numerous members of Plaintiff Save Girls' Sports.

162.    Defendant CDE, through its enforcement of AB 1266, has caused other school districts to allow males to participate in female athletic programs.

163.    For example, A.H., a biological male competed on Jurupa Unified School District's girls' track and field team during the 2024-2025 season, winning California state titles in the girls' high jump and long jump.

164.    For each placement A.H. earned in track and field, every female athlete who finished behind A.H. in that event was displaced.

165.    A.H. competed against Save Girls' Sports members, R.H. and O.V., displacing them from placements in numerous events across the 2024-2025 track and field season.

166.    In total, A.H. participated in approximately forty-two different track and field events as a member of the JVHS girls' track and field team during the 2024-2025 season, displacing many female athletes, including numerous members of Save Girls' Sports.

167.    Under Defendant CDE's enforcement of AB 1266, A.H. currently plays on the Jurupa Valley High School (JVHS) girls' varsity volleyball team.

168.    At least ten California girls' volleyball teams forfeited matches against JVHS because of the inclusion of A.H. on the girls' volleyball team.

169.    Through enforcement of AB 1266, Defendants also allow males to use and access female spaces, including bathrooms and locker rooms.

170.    On several occasions, K.S. and T.S. were both in the girls' bathroom while M.L. was in the same bathroom. Plaintiffs K.S. and T.S. felt uncomfortable, and as a result, avoided using the girls' bathroom in an attempt to avoid sharing an intimate space with M.L.

171.    Save Girls' Sports member, R.M., has avoided using the locker room to avoid changing in the presence of a male.

172.    Plaintiffs T.S. and K.S. are current athletes and will continue to face harm as long as males are allowed to compete in their sports programs and access female spaces like bathrooms and

locker rooms. Both T.S. and K.S. have upcoming athletic seasons during which a biological male could participate in their events.

173.    Plaintiff Save Girls' Sports will continue to face harm as long as males are allowed to compete in their sports programs and access female spaces like bathrooms and locker rooms.

174.    The harm suffered by Plaintiffs in this case is capable of repetition yet likely to evade review.

**F.    DEFENDANTS' SPEECH POLICY**

175.    Defendant RUSD approved and enacted Board Policy 5132: Dress and Grooming on or about June 26, 2018 (hereinafter, "Speech Policy"). A true and correct copy of the Speech Policy is attached as **Exhibit 3**.

176.    Defendants Iacuone and Chann, as District administrators, had unbridled discretion to enforce the Speech Policy against K.S., T.S., and other members of SGS.

177.    The Speech Policy "provides guidance to school sites to maintain safe, healthy, and effective learning environments." *See* **Exhibit 3**.

178.    The Speech Policy includes a section entitled "Students Cannot Wear" which incorporates Defendants' Speech Policy. *Id.*

179.    Students cannot wear clothing or accessories with images or language that:

- Is violent

- Depicts drugs or alcohol (or any illegal item or activity) or their use

- Includes hate speech, profanity, or pornography (including symbols)

- Is likely to create a hostile or intimidating environment based on any protected class.

*Id.*

180.    If a student violates the Speech Policy, school sites "will implement progressive interventions," including:

- Warning and self-correct dress code violation

- Offer students a change of nondescript and/or school-specific clothing

- Offer parent/guardian the opportunity to bring a change of clothes.

1  *Id.*

2       181.    "Repeated violations may result in a parent-school conference and/or other means of

3  correction." *Id.*

4       182.    Under the Speech Policy, school officials can censor expression that they deem

5  inappropriate or that they subjectively determine targets a certain group even if this expression is

6  not materially and substantially disruptive.

7  **G.    CENSORSHIP OF PLAINTIFFS' SPEECH**

8       183.    Because Defendants did not apply equal standards when considering the girls'

9  Varsity Top 7, on or about October 26, 2024, while attending the Mt. SAC Invitational,

10  approximately 18-20 parents and grandparents of MLKHS student athletes wore t-shirts with the

11  message "Save Girls' Sports" on the front of the shirt and the message "It's Common Sense. XX ≠

12  XY" on the back of the shirt (hereinafter, "'Save Girls' Sports' shirts"). These are pictures of the

13  front and back of the "Save Girls' Sports" shirts:





VERIFIED SECOND AMENDED COMPLAINT

1

2

3

4    184.    Three MLKHS student athletes, including K.S. and T.S. and M.K., the SGS member

5    who forfeited her girls' Varsity Top 7 position, wore the "Save Girls' Sports" shirts. K.S. and T.S.

6    wore their "Save Girls' Sports" shirts at the end of their races, while the SGS member wore the shirt

7    during the whole meet. This is a picture of K.S. and T.S. wearing their "Save Girls' Sports" shirts:

8

9

10

11

12

13

14

15

16



17    185.    Parents from Santiago High School, another school in attendance at the Mt. SAC

18    Invitational, wore shirts with the message, "Protect Women's Sports XY Does Not Equal XX."

19    186.    The winner of the Girls' Sweepstakes Race, a female student from Santiago High

20    School, put her "Protect Women's Sports XY ≠ XX" shirt on as soon as she crossed the finish line.

21    This is a picture of the shirt this female student athlete wore:

22

23

24

25



26

27

28

VERIFIED SECOND AMENDED COMPLAINT

187.   To Plaintiffs' knowledge, no student or parent complained about the "Save Girls' Sports" shirts during or following the Mt. SAC Invitational to the District, to K.S. or T.S., or to their parents. In fact, there was no disruption that occurred at the Mt. SAC Invitational as a result of the shirts.

188.   Plaintiffs, students, and their family members wore these shirts in response to the discrimination T.S. and her teammates faced due to District Defendants' preferential treatment given to M.L. and State Defendants' allowance of biological males to participate in female sports and access female spaces.

189.   On or about November 1, 2024, K.S. and T.S. wore the "Save Girls' Sports" shirts to their cross-country practice.

190.   K.S. and T.S. wore the shirts as a result of Defendants' discrimination against Plaintiffs, including Defendants' preferential treatment given to M.L. and State Defendants' allowance of biological males to participate in female sports and access female spaces.

191.   The expressions on the "Save Girls' Sports" shirts represent K.S. and T.S.'s efforts to promote equality, safety, and fairness for female athletes.

192.   The expressions on the "Save Girls' Sports" shirts also represent K.S. and T.S.'s Christian religious beliefs that God created boys and girls with unique biological differences.

193.   Consistent with their Christian religious beliefs, K.S. and T.S. respect all people and treat all people with kindness.

194.   K.S. and T.S. are advocates of fairness and equal opportunities within girls' sports, including on their cross-country team.

195.   The messages on the shirts were not directed toward any teammate or student or individual.

196.   At this November 1, 2024, practice, no student complained about the "Save Girls' Sports" shirts to K.S. or T.S or was visibly upset by the girls' shirts. There was no disruption whatsoever at the school or during the practice as a result of the shirts.

197.    During this cross-country practice, Defendant Chann approached K.S. and T.S. and told them they needed to remove their shirts or wear their shirts inside out so the "Save Girls' Sports" messaging could not be seen.

198.    When K.S. and T.S. asked why Defendant Chann was asking them to change their shirts, Defendant Chann expressed that the shirts' messages created a "hostile" environment.

199.    K.S. and T.S. further asked how the shirts created a "hostile" environment and Defendant Chann stated that wearing the "Save Girls' Sports" shirts was analogous to a student who wore a shirt with a swastika in front of a Jewish student.

200.    T.S. asked Defendant Chann whether bracelets or messages expressing viewpoints different from T.S.'s or those considered hostile by T.S. would be allowed. Defendant Chann responded that such items and messages would be permitted.

201.    T.S. apologized, and though in disagreement to Defendant Chann's directive to change their shirts, K.S. and T.S. changed their shirts so they could continue to participate in practice.

202.    M.L. was not in attendance at this practice when Defendant Chann directed Plaintiffs to change their shirts.

203.    Following the censorship of the messages on Plaintiffs' shirts, K.S.'s mother contacted Defendants Chann and Iacuone asking for further explanation as to why K.S. was directed to remove her "Save Girls' Sports" shirts. *See* **Exhibit 4**.

204.    Following the censorship of the messages on Plaintiffs' shirts, T.S.'s mother contacted the District asking for further explanation as to why T.S. was directed to remove her "Save Girls' Sports" shirts. *See* **Exhibit 5**.

205.    On or about November 4, 2024, Defendant Chann responded to T.S.'s mother's inquiry and wrote, "I am looking into a couple of things, and I will get back to you as soon as possible." *See* **Exhibit 5**.

206.    On or about November 5, 2024, Defendant Chann responded to K.S.'s mother's inquiry and wrote, "We are working on a few things and hope to have something for you soon." *See* **Exhibit 4**.

207. On or about November 4, 2024, T.S.'s mother filed a Uniform Complaint. *See* **Exhibit 6**.

208. On or about November 5, 2024, T.S.'s mother reached out to the Equity Officer, the Deputy Superintendent, and the School Board Executive Assistant requesting an explanation regarding the shirt censorship issue.

209. The School Board Executive Assistant asked whether T.S.'s mother would like her to forward this communication to the Riverside Unified School District Board of Education. T.S.'s mother confirmed that she wanted her communication to be forwarded.

210. On or about November 6, 2024, Defendant Iacuone sent separate written responses to Plaintiffs' mothers.

211. Defendant Iacuone referenced the District's Speech Policy and stated that the "Save Girls' Sports" shirts "create a hostile environment for one of the athletes on the team." She stated, "[T]he t-shirts are reasonably understood as being directed at a specific transgender athlete on the team, and reasonably may be understood as intended to intimidate, belittle, or hurt that athlete."

212. Defendant Iacuone reiterated Defendant Chann's example that similarly "a student who wore a shirt with a swastika to school was creating a hostile environment for Jewish students." *Id.*

213. Defendant Iacuone stated that "[i]t is standard practice at MLKHS that when students are in violation of the dress code, administrators explain the violation, ask the student to change and offer an alternative clothing article so they can continue about their day without disruption." *Id.*

214. Defendant Iacuone confirmed that the interaction that took place between K.S. and T.S. and Defendant Chann was done "in accordance with this process."

215. Defendant Iacuone also stated that if there was ever something that Plaintiffs deemed "hostile," they would need to go to Student Support Services and file an incident report.

216. No incident report was filed regarding Plaintiffs' "Save Girls' Sports" shirts prior to the censorship by Defendants.

217. To date, T.S.'s mother has not received any further response from the District regarding the shirt censorship issue or her Uniform Complaint.

218.    In Plaintiffs' experiences, many of their teammates agree with their religious views of human identity, sex, and gender but are afraid to express their views because of the social consequences of expressing a view that differs from the view promoted by authority figures in the school community.

219.    K.S. and T.S. respect the right of others to express views that differ from their own. They seek only the right to engage in the topics that are already being addressed and to express their own views on these topics.

220.    Defendants RUSD, Iacuone, and Chann regularly permit K.S. and T.S.'s teammates and classmates to wear clothing and apparel with various political, social, and religious messages on them.

221.    To date, K.S. and T.S. have only received positive comments from their teammates regarding their "Save Girls' Sports" shirts.

222.    On December 4, 2024, over 100 students, some members of SGS, wore the "Save Girls' Sports" shirts to MLKHS in support of K.S. and T.S.

223.    Students and members of SGS wore the "Save Girls' Sports" shirts to support T.S. and K.S. in their right to be free from discrimination on the cross-country team following T.S.'s removal from the varsity team and the loss of athletic opportunities due to a biological male's participation in the female cross-country team.

224.    On December 4, 2024, District administrators stood at the gates of the school and told any students that were wearing the "Save Girls' Sports" shirts that their shirts were "hostile" and that they would need to cover their shirts.

225.    District administrators detained several female students for wearing the "Save Girls' Sports" shirts on school campus, including several SGS members. District officials detained the students for several hours and prevented them from participating in instructional time.

VERIFIED SECOND AMENDED COMPLAINT

226.    District administrators, including Defendant Iacuone, told students A.S. and L.S., both SGS members, and M.P.[11], that they were not permitted to wear the SGS shirts, citing the District Speech Policy.

227.    A.S., L.S., and M.P. told District administrators that they wore the shirts to support T.S. and K.S. and to express their beliefs that men and women have biological differences.

228.    A.S., L.S., and M.P. told District administrators that the "Save Girls' Sports" message "XX ≠ XY" is a biological statement that is taught in District curriculum. Defendant Iacuone stated that as a former biology teacher, she never taught that XX does not equal XY and that no teacher on campus teaches this concept.

229.    The students questioned District administrators about why pride flags were allowed in classrooms and why members of the LGBTQ+ community could wear bracelets supporting their beliefs, while they were not permitted to express their beliefs by wearing their "Save Girls' Sports" shirts.

230.    District administrators told the students that those issues had not been presented to them.

231.    Most recently, on January 23, 2025, MLKHS students of the Gay Straight Alliance were permitted to operate a table on school campus containing messages and QR codes promoting various LGBTQ+ messaging.

232.    Defendant Iacuone told A.S., L.S., and M.P. that the only resolution would be to cover the "Save Girls' Sports" shirts with a jacket and if they refused to cover their shirts, they would receive a Speech Policy violation.

233.    Defendant Iacuone also told A.S., L.S., and M.P. that they were not a protected class under Title IX.

234.    After spending nearly three hours in the school office, the students agreed to cover their shirts so that they could return to their classes.

---

[11] To protect the identity of the female athlete, alternative initials – M.P. – are used in place of the real name or initials of the student in this Complaint.

235.    Following these events, the MLKHS ASB Director asked L.S.'s friend, who is openly gay, how the "Save Girls' Sports" shirts made him feel.

236.    The student responded that he was not bothered by the "Save Girls' Sports" shirts.

237.    On December 5, 2024, L.S. and M.P. were called to the school office to meet with District officials, including Defendant Iacuone and Bethany Scott, the Title IX Coordinator.

238.    Mrs. Scott, noticing a church sticker on M.M.'s water bottle, questioned how M.P., as a Christian, could contribute to fostering a hostile and hurtful environment for the LGBTQ+ community.

239.    Mrs. Scott also told the students that as "white, straight females" they would not be protected in this situation and claimed they did not understand what it feels like to be targeted for race or gender identity.

240.    At a meeting later that afternoon, District administrators told L.S. and M.P. and their parents that the "Save Girls' Sports" shirts were considered disrespectful and hurtful to the transgender community.

241.    Defendants' Speech Policy is, on its face, and as applied in this case, overbroad, impermissibly vague and subject to abuse. This policy effectively grants unbridled discretion to school officials as to its application and it therefore violates the First and Fourteenth Amendments of the United States Constitution.

242.    Since Defendants, and each of them, have established and are maintaining under color of law of the State of California a policy of denying K.S.'s and T.S.'s and members of SGS' freedom of expression, Plaintiffs have suffered, are suffering, and will continue to suffer severe and irreparable injury by virtue of Defendants' acts, policies and practices as set forth herein. Their fundamental constitutional rights have been violated and will continue to be violated.

243.    K.S. and T.S. and members of SGS want to continue wearing their "Save Girls' Sports" shirts to advocate for equal opportunities for females in sports.

244.    K.S. and T.S. and members of SGS are refraining from wearing their "Save Girls' Sports" shirts or other shirts bearing similar messages out of fear that they will again be found to have violated the Defendants' Speech Policy challenged herein and thus be subject to punishment.

245.    The acts of Defendants, and each of them, are chilling and deterring Plaintiffs' free exercise of rights of speech. Plaintiffs have no plain, adequate, or complete remedy at law to redress the violations of their rights, and this suit for injunction, declaratory judgment, and damages is their only means of securing complete and adequate relief. No other remedy would offer Plaintiffs substantial and complete protection from continuation of Defendants' unlawful and unconstitutional acts, policies, and practices.

**FIRST CAUSE OF ACTION**

**FIRST AMENDMENT: FREEDOM OF SPEECH**

**(FACIAL CHALLENGE)**

**(42 U.S.C. § 1983)**

**(AS AGAINST DEFENDANTS IACUONE, CHANN)**

246.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 245 of this Complaint.

247.    Students do not shed their constitutional rights at the schoolhouse gate.

248.    K.S., T.S., and SGS members' expression is fully protected under the First Amendment, which prohibits the government from "abridging the freedom of speech." This prohibition applies to state and local governments through the Fourteenth Amendment.

249.    Non-disruptive, individual student expression is protected by the First Amendment of the United States Constitution.

250.    Defendant RUSD approved and enacted the Speech Policy.

251.    Defendants Iacuone and Defendant Chann enforce the Speech Policy.

252.    Defendants' Speech Policy is vague and overbroad because it restricts student speech that does not and will not materially and substantially disrupt the educational process.

253.    Defendants' Speech Policy discriminates against speech based on content, as it allows certain types of messages while restricting others.

254.    Defendants' Speech Policy discriminates against speech on the basis of the speaker's viewpoint, as it allows viewpoints it favors, but does not allow viewpoints it disfavors.

255.    K.S., T.S., members of SGS, and other students wore their "Save Girls' Sports" shirts in response to Defendants' discrimination as well as to advocate for the fair and equal treatment of female athletes.

256.    The messages on the "Save Girls' Sports" shirts have not and do not disrupt the educational process.

257.    Defendants permit other messages to be displayed and worn, including table displays, bracelets, and flags that promote or support LGBTQ+ issues.

258.    Yet, Defendants' Speech Policy prohibits speech that the District disagrees with, specifically, "Save Girls' Sports" and "XX ≠ XY."

259.    Defendants' Speech Policy restrains constitutionally protected speech in advance of its expression, with virtually no guidelines or standards to guide the discretion of school officials charged with enforcing the Policy.

260.    Defendants' Speech Policy chills the free speech of Plaintiffs and other students as it does not allow them to wear messages that promote fairness and safety for female athletes. Defendants' Speech Policy allows the exercise of unbridled discretion.

261.    Defendants' Speech Policy improperly restricts speech solely because it may be deemed "hostile," without providing clear guidelines on how speech is determined to be "hostile."

262.    Defendants' policies, and the enforcement thereof, thus violate the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment.

263.    As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered, and will suffer, irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief against Defendants Iacuone and Chann in their official capacities.

264.    Additionally, Plaintiffs are entitled to nominal damages and compensatory damages against Defendants Iacuone and Chann in their individual capacity in an amount to be proven at trial, and attorneys' fees under 42 U.S.C. § 1988.

**SECOND CAUSE OF ACTION**

**FIRST AMENDMENT: FREEDOM OF SPEECH**

**(AS APPLIED CHALLENGE)**

**(42 U.S.C. § 1983)**

**(AS AGAINST DEFENDANTS IACUONE, CHANN)**

265.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 264 of this Complaint.

266.    An as-applied challenge to a law challenges a statute to a specific circumstance and assumes that a court can separate valid from invalid rules or applications. *Hoye v. City of Oakland*, 653 F.3d 835, 857 (2011).

267.    Students do not shed their constitutional rights at the schoolhouse gate.

268.    K.S., T.S., and SGS members' expression is fully protected under the First Amendment, which prohibits the government from "abridging the freedom of speech." This prohibition applies to state and local governments through the Fourteenth Amendment.

269.    Non-disruptive, individual student expression is protected by the First Amendment of the United States Constitution.

270.    Defendant RUSD approved and enacted the Speech Policy.

271.    Defendants Iacuone and Channe enforced the Speech Policy.

272.    Pursuant to Defendants' Speech Policy, Defendants Iacuone and Chann, as District administrators, singled out Plaintiffs' expression and have prevented them from displaying their messages on their shirts at MLKHS.

273.    District administrators detained various other students, including SGS members, for wearing the "Save Girls' Sports" shirts and threatened disciplinary action if the students continued to wear or display the messages on the shirts.

274.    Plaintiffs' expression – "Save Girls' Sports" and "It's Common Sense. XX ≠ XY" – did not and does not materially and substantially interfere with the orderly conduct of educational activity at MLKHS.

275.    Defendants' Speech Policy discriminates against speech based on content, as it

allows certain types of messages while restricting others.

276. Defendants' Speech Policy discriminates against speech on the basis of the speaker's viewpoint, as it allows viewpoints it favors, but does not allow viewpoints it disfavors.

277. Defendants' Speech Policy restrains constitutionally protected speech in advance of its expression, with virtually no guidelines or standards to guide the discretion of school officials charged with enforcing the Speech Policy.

278. Defendants' Speech Policy chills the free speech of Plaintiffs and other students as it does not allow them to wear messages that promote fairness and safety for female athletes.

279. Defendants' Speech Policy allows the exercise of unbridled discretion.

280. Defendants' Speech Policy improperly restricts speech solely because it may be deemed "hostile," without providing clear guidelines on how speech is determined to be "hostile."

281. Defendants censor Plaintiffs' expression but permit other students to wear apparel with different messages as well as permit the District to display messages on related topics.

282. Defendants permit other students to regularly wear badges, pins, and flags that promote LGBTQ+ ideas.

283. The District displays pride flags and transgender flags across campuses and other messages supporting the LGBTQ+ community.

284. Defendants censor Plaintiffs' shirts but permit other students to wear apparel with different messages on different types of topics.

285. Defendants have no compelling reason to censor speech that seeks to advocate for equal rights for women in sports.

286. Defendants' Speech Policy and practice are not reasonably related to any legitimate pedagogical concerns as it seeks to censor speech that advocates for the protection of equal rights for women in sports.

287. Defendants' policies, and the enforcement thereof, thus violate the Free Speech Clause of the First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment.

288. As a direct and proximate result of Defendants' violation of the First Amendment,

36

Plaintiffs have suffered, and will suffer, irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief against Defendants Iacuone and Chann in their official capacities.

289.    Additionally, Plaintiffs are entitled to nominal damages and compensatory damages against Defendants Iacuone and Chann in their individual capacities in an amount to be proven at trial, and attorneys' fees under 42 U.S.C. § 1988.

**THIRD CAUSE OF ACTION**

**FOURTEENTH AMENDMENT: DUE PROCESS**

**(42 U.S.C. § 1983)**

**(AS AGAINST DEFENDANTS IACUONE, CHANN)**

290.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 289 of this Complaint.

291.    The Speech Policy is vague and lacks sufficient objective standards to curtail the discretion of school officials, which allow Defendants to enforce the policies in an *ad hoc* and discriminatory manner.

292.    Defendant RUSD approved the Speech Policy.

293.    Defendants Iacuone and Chann, as District administrators, had unbridled discretion to enforce the Speech Policy against K.S. and T.S.

294.    The Speech Policy requires Defendants to arbitrarily determine what is and is not "likely to create a hostile or intimidating environment based on any protected class."

295.    Students of common intelligence must guess as to whether their expression is "likely to create a hostile or intimidating environment based on any protected class."

296.    Defendants' Speech Policy and practice allow school officials to act with unbridled discretion when deciding whether student expression is "likely to create a hostile or intimidating environment based on any protected class."

297.    Defendants have no compelling reason that would justify their censorship of the expression on Plaintiffs' "Save Girls' Sports" shirts.

298.    The Speech Policy, and Defendants' enforcement thereof, therefore, violate the Due

Process Clause of the Fourteenth Amendment to the United States Constitution.

299.    As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered, and will suffer, irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief against Defendants Iacuone and Chann in their official capacities.

300.    Additionally, Plaintiffs are entitled to nominal damages and compensatory damages against Defendants Iacuone and Chann in their individual capacities in an amount to be proven at trial, and attorneys' fees under 42 U.S.C. § 1988.

**FOURTH CAUSE OF ACTION**

**TITLE IX: SEX DISCRIMINATION**

**DEFENDANTS' INTENTIONAL DISCRIMINATION AGAINTS PLAINTIFFS**

**(PLAINTIFFS T.S., K.S., SAVE GIRLS' SPORTS AS AGAINST DEFENDANT RUSD)**

301.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 300 of this Complaint.

302.    Defendant RUSD participates in the California Interscholastic Federation.

303.    Defendant RUSD receives federal funding and is required to act in accordance with Title IX.

304.    Defendant RUSD approved and enacted Board Policy 6145.2: Athletic Competition.

305.    Pursuant to Board Policy 6145.2 and as district administrators, Defendants Iacuone and Chann are responsible for site-level decision for MLKHS athletic activities.

306.    Title IX provides, in relevant part, that:

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. 20 U.S.C. Section 1681(a).

307.    Congress intended to give Title IX broad reach to protect a wide range of intentional unequal treatment. *See North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 521 (1982).

308.    To "discriminate" means "[t]o make a difference in treatment or favor (of one as compared with others)." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 657

38

(2020) (quoting *Webster's New International Dictionary* 745 (2d ed. 1954)). More specifically, it means treating an individual worse than those who are similarly situated. *Id.* at 657.

309.    To support a claim of intentional discrimination, a plaintiff must show that a defendant "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

310.    It is enough to show that "but-for the plaintiffs' status as females, would the defendants have treated them more favorably." *Soule v. Connecticut Ass'n of Sch.*, No. 3:20-CV-00201(RNC), 2024 WL 4680533, at *18 (D. Conn. Nov. 5, 2024).

311.    Intentional discrimination may also be shown by demonstrating that an official with authority to address the alleged discrimination had actual knowledge of the discrimination and failed to adequately respond, amounting to deliberate indifference. *Karasek v. Regents of University of California*, 956 F.3d 1093, 1104–05 (9th Cir. 2020).

312.    Additionally, the discrimination must be severe, pervasive, and objectively offensive, such that it effectively bars the victim's access to an educational opportunity or benefit. *Id.* at 1105.

313.    Here, Defendant RUSD discriminated against Plaintiffs based on their biological sex and, conversely, treated M.L. more favorably than Plaintiffs because of M.L.'s gender identity.

314.    Defendant Chann promoted M.L. to the girls' cross-country Top 7 team, despite M.L.'s failure to comply with varsity requirements, including the mandatory practice requirement.

315.    The school handbook only permits an athlete to miss one workout without potential consequences. The handbook also states that "[t]he coaching staff will require all juniors and seniors to be fully vested in the cross-country program and 100% of its requirements."

316.    K.S. and T.S. attended all practices as required, even while injured and sick, and did so for the entirety of the practices. M.L. only attended around 13 of the 74 practices and of those 13 practices M.L. typically attended less than half of the practice.

317.    Regardless, Defendant Chann elevated M.L. to the Top 7 team over the Plaintiffs and the other biological girls on the team who had complied with the handbook's requirements. Defendants' preferential treatment was based on M.L.'s gender identity.

318.    Defendant Chann gave M.L. further preferential treatment by giving M.L. one-on-one coaching and running alone with M.L., separate from the team. Defendant Chann's action gave M.L. advantages and opportunities because of M.L.'s gender identity that were not provided to any other member of the girls' cross-country team.

319.    Defendant RUSD permitted M.L. to regularly skip practice, but did not permit T.S. to do the same, despite T.S.'s 6th period being a P.E class for which she did not need credits. This required T.S. to take summer school classes to allow her to run cross-country and keep up with her educational requirements.

320.    By elevating M.L. because of M.L.'s gender identity, Defendant Chann also demoted T.S. from the Top 7 team despite T.S. being the captain of the team and having attended each practice for its entirety.

321.    When Plaintiffs, through their parents, filed complaints and sought answers for School Defendants' preferential treatment of M.L., their complaints were not taken seriously, no investigation was done, and School Defendants have yet to provide answers.

322.    The handbook's requirements have been universally enforced against the biological girls on the team, but are not enforced against M.L., a biological male. School Defendants gave M.L. preferential treatment because of M.L.'s gender identity. But for Plaintiffs' biological sex and gender identity, they would have been treated more favorably.

323.    Because School Defendants are the authorities at the school, they had the authority and control over their actions but decided to give preferential treatment to M.L. *See Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999).

324.    School Defendants' actions were severe, pervasive, and objectively offensive such that Plaintiffs have been deprived of access to the educational opportunities and benefits that are provided by the school. *Id*. at 645.

325.    By giving preferential treatment to M.L., School Defendants caused mental harm to Plaintiffs–signaling that Plaintiffs are unimportant and that their effort, time, and dedication are less valued. School Defendants' actions also caused Plaintiffs to miss out on numerous benefits and opportunities. These opportunities included being able to participate in Top 7 races – which are highly important for college scouting and scholarship offers – being able to attend a class of their choice during 6th period to permit them to graduate early or setting their school schedules so they do not have to attend summer school, among others.

326.    School Defendants had actual authority to address the discrimination and had knowledge of the discrimination as School Defendants were the ones who were discriminating. *Id*. at 650.

327.    School Defendants' response to the discrimination was unreasonable both because they were the ones who were discriminating and, following the complaints, School Defendants failed to investigate the issues thoroughly, correct the issues, or provide Plaintiffs with answers to their inquiries. *See id*. at 648.

328.    Even after issues were brought to School Defendants' attention, Defendants continued to discriminate against Plaintiffs.

329.    School Defendants' harassment and subsequent indifference caused Plaintiffs' harm. *Id*. at 645.

330.    AB 1266 permits M.L., a biological male, to participate in female sports and use female spaces, thereby, violating the federal protections of Title IX.

331.    As a result of School Defendants' enforcement of AB 1266 and discrimination against Plaintiffs, School Defendants permitted M.L. to take podium positions and other opportunities from deserving biological female athletes.

332.    Such harm includes loss of the experience of fair competition; loss of correct placements; loss of medals; loss of victories and the public recognition associated with victories; loss of opportunities to advance to higher-level competitions; and loss of visibility to college recruiters.

333.    Plaintiffs seek monetary damages in an amount to be proven at trial, including compensatory damages, punitive damages, prejudgment interest, declaratory relief, and any other relief deemed appropriate by the Court.

### FIFTH CAUSE OF ACTION

### TITLE IX: EFFECTIVE ACCOMMODATION VIOLATION

### (PLAINTIFFS T.S., K.S., SAVE GIRLS' SPORTS AS AGAINST DEFENDANT RUSD)

334.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 333 of this Complaint.

335.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and its implementing regulations, 34 C.F.R. § 106.1 et seq., prohibit discrimination on the basis of sex in any education program or activity receiving federal financial assistance. The Riverside Unified School District receives federal funding and is therefore subject to Title IX.

336.    Under Title IX's regulations, schools must provide athletic opportunities that "effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1). Compliance with this effective accommodation requirement is assessed using a three-prong test established by the U.S. Department of Education's 1979 Policy Interpretation, 44 Fed. Reg. 71,413 (Dec. 11, 1979), as interpreted by the Ninth Circuit. *See Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 965 (9th Cir. 2010); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 855–56 (9th Cir. 2014).

337.    "Sex" under Title IX refers to biological sex, defined by immutable biological classifications as male or female based on reproductive function, chromosomes, and other physiological characteristics. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022); Exec. Order No. 14168 (Jan. 20, 2025). Title IX permits separate teams for each sex where selection is based on competitive skill, recognizing physiological differences to ensure equal participation opportunities for biological females. 34 C.F.R. § 106.41(b).

338.    Congress passed an effective accommodation requirement because it is necessary to ensure the levels of competition for girls accommodate their interest and abilities. *Mansourian*, 816 F.Supp.2d at 964. Title IX recognizes that in some sports, physiological or other differences between

the sexes may prevent one of the sexes from being selected based solely on skill or from being able to effectively compete if they are required to compete with members of the opposite sex. 44 Fed. Rep. 71,418.

339.    Defendant RUSD's enforcement of AB 1266, which requires permitting participation in sex-segregated athletic programs based on gender identity rather than biological sex, denies biological females' equal opportunities to participate in athletics.

340.    AB 1266 further discriminates against women by taking away a protection granted to them by Title IX. Title IX was created to give biological women a safe space to compete, entirely distinct from males, when women are unable to fairly compete through an integrated team. AB 1266 takes away this protection by allowing biological boys into this space.

341.    Here, the elements have been met to require MLKHS to sponsor a girls' cross-country team – which means that MLKHS *must* provide a cross-country team for biological girls.

342.    First, the opportunities for girls to participate in high school sports have historically been limited. Title IX was created as a response to discrimination against women in the educational field. *See also See* Dionne L. Koller, Not Just One of the Boys: A Post–Feminist Critique of Title IX's Vision for Gender Equity in Sports, 43 Conn. L.Rev. 401, 403–5 (2010) (noting the massive disparity in women's athletics prior to Title IX's enactment and the growth of women's sports following its enactment).

343.    Second, there has been sufficient interest and competition among girls at MLKHS in running cross-country as the team is highly popular and has a history of success in the conference. The team consists of 20+ members and has a Top 7 team, Varsity, and Junior Varsity team.

344.    Third, girls at MLKHS do not possess sufficient race times to be selected or effectively compete with the boys' cross-country team. The Top 7 races times for the boys' cross-country team range from 15:29 to 17:08. The fastest female run time is 18:07, almost a minute slower than the 7th place time on the boys' team.

345.    The competitiveness of girls' athletics in RUSD is not equal to boys' athletics.

346.    Plaintiffs have an interest, and have expressed this interest to School Defendants, in female-only sports teams and competitions that fairly accommodate their interests and abilities.

347.    Defendants' discriminatory policies and practices cause Plaintiffs to have materially fewer athletic opportunities than they previously enjoyed because they no longer can compete in fair, exclusively female competition.

348.    Defendant RUSD provided inferior competitive opportunities and facilities to girls' athletic programs compared to boys' programs. By allowing biological males to compete on girls' teams, Defendant RUSD imposed unfair physiological advantages on girls' competitions (e.g., cross-country meets and track and field events), thereby denying Plaintiffs and other female athletes the benefits of sex-segregated, equitable competition that Title IX is intended to protect.

349.    This creates a hostile and unsafe competitive environment in girls' events where girls face intimidation, injury risks, and lost opportunities.

350.    Defendant RUSD also allows males to access girls' spaces, including bathrooms and locker rooms.

351.    This program-wide inequality – even with just one male athlete – deprives the girls' programs of the full educational and developmental benefits of athletics, such as skill-building in equitable settings and safe use of facilities and programs.

352.    At MLKHS, the inclusion of M.L., a biological male, on the girls' cross-country team displaced T.S. from her earned position on the Varsity Top 7, preventing her from participating in the Mt. SAC Invitational on October 25-26, 2024 – a premier event for college recruitment and recognition.

353.    In practice, Defendants' actions have had the effect of taking away from T.S., a biological girl, the chance to compete on the Top 7 team in a race, which was the actual level of race that was consummate with her ability.

354.    K.S., ranked second or third on the junior varsity team and a contender for varsity, was blocked from advancement due to reduced spots.

355.    Members of Save Girls' Sports, including M.K., and numerous female athletes, have been similarly displaced in cross-country, leading to decreased participation and unaccommodated interest.

356.    Additionally, Defendant RUSD allowed M.L. to compete on the girls' track and field team, displacing numerous Save Girls' Sports members, including A.S., R.M., and A.R.

357.    As a result of Defendant RUSD's actions, M.L. received awards and medals that would have otherwise gone to female athletes had M.L. not been permitted to participate on the girls' cross-country team.

358.    Plaintiffs K.S. and T.S. avoided using the girls' bathroom in an attempt to avoid sharing an intimate space with M.L.

359.    Save Girls' Sports member, R.M., has avoided using the locker room to avoid changing in the presence of a male.

360.    Defendant RUSD's and Defendant CDE's policies allows biological males to occupy roster spots on female teams, displacing biological females and reducing their overall performance and participation rates.

361.    M.L. and A.H. have collectively displaced hundreds of female athletes in California in track and field.

362.    As a result of Defendant RUSD's enforcement of AB 1266, biological males were allowed to participate on the girls' cross-country team at Martin Luther King High School, displacing Plaintiffs T.S. and K.S., as well as other female cross-country athletes; were allowed to participate on the girls' track and field team at Martin Luther King High School, displacing Plaintiff Save Girls' Sports members A.S., R.M., A.R., R.H., and O.V.; and contributing to the forfeiture of over ten volleyball games due to a male athlete's inclusion in girls' volleyball program in a California school district.

363.    In contrast, boys' programs enjoy fair, competitive opportunities and distinct facilities free from equivalent intrusions.

364.    As a result, Defendant RUSD fails to effectively accommodate the athletic interests and abilities of biological females.

365.    Because MLKHS sponsors a boys' sports teams, it *must* sponsor teams for "members of the other sex," which in this case is girls.

366.    Defendant RUSD does not fully and effectively accommodate the athletic interests and abilities of biological females.

367.    The harm suffered in this case is capable of repetition yet likely to evade review.

368.    Such harm includes loss of the experience of fair competition; loss of correct placements; loss of medals; loss of victories and the public recognition associated with victories; loss of opportunities to advance to higher-level competitions; loss of visibility to college recruiters; and loss of privacy.

369.    Accordingly, Plaintiffs are entitled to the relief requested herein.

## SIXTH CAUSE OF ACTION

## TITLE IX: EQUAL TREATMENT VIOLATION

## (PLAINTIFFS T.S., K.S., SAVE GIRLS' SPORTS AS AGAINST DEFENDANT RUSD)

370.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 369 of this Complaint.

371.    Equal treatment claims arise from Title IX Section 106.41(c)(2)-(10), which has been interpreted to require "equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes." *See Mansourian*, 602 F.3d at 964-65.

372.    Section 106.41(c)(2)–(10) sets forth factors meant to compare sex-separated programs to ensure that the male program and female program are sufficiently equal (or that their disparities are fairly attributable to non-discriminatory factors). Congress explicitly meant to compare *biologically* sex-separated teams. 44 Fed. Reg. 71,415–18 (comparing the "equivalence for men and women of: . . .".)

373.    Just like in effective accommodation claims in equal treatment claims, the overall determination of compliance requires an examination of:

- Whether the policies of an institution are discriminatory in language or effect; or

- Whether disparities of a substantial and unjustified nature in the benefits, treatment, services, or opportunities afforded male and female athletes exist in the institution's program as a whole; or

1         •   Whether disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity. 44 Fed. Reg. 71,417.

2

3     374.   Equal treatment claims consider the "equivalence in the availability, quality and

4 kinds of other athletic benefits and opportunities provided male and female athletes." *See*

5 *Mansourian*, 602 F.3d at 964-65.

6     375.   For an equal treatment claim under Title IX, the governing principle is that "male

7 and female athletes should receive equivalent treatment, benefits, and opportunities." Policy

8 Interpretation, 44 Fed. Reg. at 71,414.

9     376.   In *Clark v. Arizona Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982), the

10 Court noted that due to physiological differences, men will often displace women to a substantial

11 extent if they are allowed to compete against women for positions on a team. In such circumstances

12 "*athletic opportunities* for women [are] diminished." *Id.* (emphasis added).

13     377.   The Court further noted that there are very real differences between the sexes that

14 allow gender to be used as a proxy so long as it is an accurate proxy. *Id.*

15     378.   In the present matter, there is no question that biological males have a distinct

16 advantage in cross-country and track and field. While it is difficult to impute general characteristics

17 to any specific individual, prior to attending MLKHS, M.L. set the girls' all-time cross-country

18 records at that previous school. And for MLKHS, M.L.'s times often warrants placement in the Top

19 7 team as the times are some of the fastest on the team. Further, M.L. received MLKHS's fastest

20 senior girl award in December 2024. A.H. won state female titles in multiple events during the 2024-

21 2025 track and field season.

22     379.   M.L. regularly placed high in the girls 200m, 100m hurdles, and 300m hurdles

23 events, displacing many female athletes, when he would have otherwise placed lower in the boys'

24 division with the same times.

25     380.   "[A] disparity in one program component (*i.e.,* scheduling of games and practice

26 time) can alone constitute a Title IX violation if it is substantial enough in and of itself to deny

27 equality of athletic opportunity to students of one sex at a school." *McCormick v. School Dist. of*

28 *Mamaroneck,* 370 F.3d 275, 293 (2d Cir. 2004).

381.    Here, AB 1266 takes away benefits and opportunities from girls by permitting biological boys to compete in girls' sports despite physiological advantages.

382.    Defendant RUSD, by permitting M.L., a biological boy, to compete in the girls' cross-country and track and field teams deprived Plaintiffs of the equal opportunities and benefits they are entitled to under Title IX.

383.    Defendant RUSD, by permitting M.L., a biological boy, to compete on the girls' cross-country team, gave M.L. preferential treatment, including providing him with one-on-one coaching, allowing him to miss mandatory practices, and treating him more favorably than Plaintiffs and the other female athletes.

384.    By allowing M.L. to bypass mandatory practice rules while holding Plaintiffs to stricter standards, Defendant RUSD has denied equal treatment to Plaintiffs and other female athletes.

385.    As noted above, to determine if the opportunities and benefits are equivalent requires comparison between the benefits and opportunities provided to the men's and women's teams. 44 Fed. Reg. 71,417–18.

386.    At MLKHS, there is a biological boys' team and an integrated team. Accordingly, there cannot even be a meaningful comparison as there is no "women's" team. As such there are no benefits or opportunities that are granted to the girls at MLKHS in the way they are granted to the boys. On this basis alone, AB 1266 violates Title IX and should be enjoined in the present case.

387.    Regardless, even to assume there is a girls' cross-country or track and field team at MLKHS, allowing M.L. to compete on the girls' teams has deprived Plaintiffs of equal opportunities and benefits under Title IX.

388.    In contrast, boys' programs enjoy fair, competitive opportunities and distinct facilities free from equivalent intrusions.

389.    T.S. was prevented from being able to compete on the Top 7 team during a race in which numerous college coaches were in attendance to scout, which would also include scholarship opportunities.

390.    In team races in which M.L. placed as a top runner, the definition of which differs from race to race, M.L. displaced a top female runner on MLKHS's team from contributing points to the team total.

391.    In cross-country, the team with the lowest score wins. Each runner's finishing position corresponds to their points (e.g., 3rd place earns 3 points, 9th place earns 9 points, etc.). When M.L. competes in a girls' race, M.L.'s performance impacts on the placement of other runners, which in turn affects the points that are added to their team's total score.

392.    When M.L. finishes a race, each girl who finished after M.L. finishes one placement lower than M.L. otherwise would have finished. In at least three, M.L. finished in the top bracket which qualified to receive a medal, meaning that, had M.L. not been permitted to race, the female athlete outside the bracket would have earned the medal. The ability to medal and to finish a girl's race in the placement earned is an opportunity that Title IX was created to protect. It is an opportunity that MLKHS provides to its boys' team, and it must be provided to its girls' team also.

393.    M.L. and A.H. have collectively displaced hundreds of female athletes in California in track and field.

394.    As discussed above, AB 1266 has created a disparity in the program as it takes away the availability and quality of opportunities for biological women by permitting such opportunities to be taken by a biological boy as long as the individual claims that their gender is female.

395.    AB 1266 has the effect of depriving Plaintiffs of quality competitive opportunities that "equally reflect [their] abilities" by permitting biological males to participate in female sports. *See* Policy Interpretation, 44 Fed. Reg. at 71,417-18.

396.    AB 1266 takes aways girls' opportunities and benefits because it does not permit them to have sex-separated teams and forces them to compete against biological males who hold physiological advantages and, as such, deprives them of equal opportunities and fair competition in their chosen sport.

397.    By allowing M.L., a biological male, to compete on the girls' cross-country and track and field teams, AB 1266 violates Title IX by displacing female athletes from the team, prestigious

races, school cross-country records, and the benefits and opportunities that come from competing and winning at the highest levels.

398.    Such harm includes loss of the experience of fair competition; loss of correct placements; loss of medals; loss of victories and the public recognition associated with victories; loss of opportunities to advance to higher-level competitions; loss of visibility to college recruiters; and loss of privacy.

399.    Accordingly, Plaintiffs are entitled to the relief requested herein.

**SEVENTH CAUSE OF ACTION**

**VIOLATION OF TITLE IX (20 U.S.C. § 1681 et seq.)**

**(FACIAL CHALLENGE)**

**(PLAINTIFFS T.S., K.S., SAVE GIRLS' SPORTS AS AGAINST DEFENDANT CDE)**

400.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 399 of this Complaint.

401.    The Supremacy Clause of the United States Constitution, Article VI, Clause 2, provides that federal law is "the supreme Law of the Land," and any state law that conflicts with federal law is preempted and without effect.

402.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and its implementing regulations, 34 C.F.R. § 106.1 et seq., prohibit discrimination on the basis of sex in any education program or activity receiving federal financial assistance. Under Title IX, "sex" refers to biological sex, defined by immutable biological classifications as male or female based on reproductive function, chromosomes, and other physiological characteristics. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022); Exec. Order No. 14168 (Jan. 20, 2025) (defining "sex" as biological and not synonymous with "gender identity").

403.    Title IX's implementing regulations expressly permit recipients of federal funds, including public schools, to maintain separate athletic teams for members of each sex where selection is based on competitive skill or the activity is a contact sport. 34 C.F.R. § 106.41(b). This provision recognizes inherent physiological differences between biological males and females, ensuring equal athletic opportunities by preventing discrimination against biological females.

50

VERIFIED SECOND AMENDED COMPLAINT

404.    California Education Code § 221.5(f) (enacted as AB 1266) mandates that students be "permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on the pupil's records." This law requires California schools to allow biological males who identify as female to participate in female-only athletic programs and use female-only facilities, regardless of biological sex.

405.    AB 1266 is facially preempted by Title IX because it irreconcilably conflicts with federal law in all its applications. By requiring schools to integrate athletic teams and facilities based on gender identity rather than biological sex, AB 1266 mandates discrimination against biological females on the basis of sex.

406.    It denies biological females' equal athletic opportunities, including fair competition, podium positions, awards, scholarships, and safe environments in locker rooms and bathrooms.

407.    This conflict is inherent and unavoidable, as AB 1266 compels schools to disregard biological sex distinctions that Title IX protects and permits.

408.    The competitiveness of girls' athletics in California is not equal to boys' athletics.

409.    Defendant CDE's policies and practices result in unequal treatment of female athletes in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., by failing to provide comparable accommodations and opportunities to girls' athletic programs as those provided to boys' programs.

410.    Specifically, Defendant CDE permits biological males to compete on girls' athletic teams and access girls' facilities, resulting in female athletes losing competitive spots and opportunities due to unfair physiological advantages. No comparable situation exists in boys' athletic programs, where male athletes do not face equivalent displacement or intrusion by members of the opposite sex.

411.    Furthermore, Defendant CDE denies female athletes equal access to sex-segregated facilities, such as locker rooms and bathrooms, by allowing biological males to use these spaces, thereby compromising the privacy, safety, and equitable use intended for female athletes under Title IX.

VERIFIED SECOND AMENDED COMPLAINT

412.    Implementation of AB 1266 exemplifies this facial conflict: Biological males were allowed to participate on the girls' cross-country team at Martin Luther King High School, displacing Plaintiffs T.S. and K.S., as well as other female cross-country athletes; biological males were allowed to participate on the girls' track and field team at Martin Luther King High School, displacing Plaintiff Save Girls' Sports members A.S., R.M., A.R., R.H., and O.V.; and the inclusion of a male athlete in a girls' volleyball program within a California school district led to the forfeiture of more than ten volleyball games.

413.    However, the preemption is not limited to these facts; AB 1266's mandate applies statewide and, in all contexts, always subordinating Title IX's protections for biological females to gender identity preferences.

414.    On June 25, 2025, the United States Department of Education Office of Civil Rights sent a Letter of Finding to Superintendent Tony Thurmond of the CDE, informing him that CDE's policies that allow boys to participate in girls' sports and to use girls' spaces "discriminate based on sex against girls in both its language and effect."[12]

415.    The letter went on to state, "Those [State] policies cause disparities of a substantial and unjustified nature in the benefits, treatment, services, and opportunities afforded to female athletes and have no meaningful impact on the benefits, treatment, services, and opportunities afforded to male athletes."[13]

416.    As a recipient of federal funding, Defendant CDE is bound by Title IX. Enforcement of AB 1266 frustrates Title IX's purpose of ensuring equal educational opportunities based on biological sex.

417.    Plaintiffs T.S., K.S., and Save Girls' Sports and its members (biological female athletes throughout California), suffer irreparable harm from AB 1266's enforcement, including lost

---

[12] U.S. Dep't of Educ., Office for Civil Rights, *Investigation Letter No. 10-256902-A* (June 25, 2025), https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/10256902-a.pdf?utm_ (last visited Oct. 24, 2025).

[13] *Id.*

athletic opportunities, unfair competition, and diminished educational benefits. This harm is redressable by invalidating AB 1266.

418.    Accordingly, Plaintiffs are entitled to the relief requested herein.

**EIGHTH CAUSE OF ACTION**

**VIOLATION OF TITLE IX (20 U.S.C. § 1681 et seq.)**

**(AS APPLIED CHALLENGE)**

**(PLAINTIFFS T.S., K.S., SAVE GIRLS' SPORTS AS AGAINST DEFENDANT CDE)**

419.    Plaintiffs re-allege and incorporate herein, as though fully set forth, Paragraphs 1 through 418 of this Complaint.

420.    Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and its implementing regulations, 34 C.F.R. § 106.1 et seq., prohibit discrimination on the basis of sex in any education program or activity receiving federal financial assistance. Defendant CDE receives federal funding and is therefore subject to Title IX.

421.    "Sex" under Title IX refers to biological sex, defined by immutable biological classifications as male or female based on reproductive function, chromosomes, and other physiological characteristics. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022); Exec. Order No. 14168 (Jan. 20, 2025). Title IX permits separate teams for each sex where selection is based on competitive skill, recognizing physiological differences to ensure equal participation opportunities for biological females. 34 C.F.R. § 106.41(b).

422.    Defendant CDE's policies and practices result in unequal treatment of female athletes in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., by failing to provide comparable accommodations and opportunities to girls' athletic programs as those provided to boys' programs.

423.    Specifically, Defendant CDE permits biological males to compete on girls' athletic teams and access girls' facilities, resulting in female athletes losing competitive spots and opportunities due to unfair physiological advantages. No comparable situation exists in boys' athletic programs, where male athletes do not face equivalent displacement or intrusion by members of the opposite sex.

VERIFIED SECOND AMENDED COMPLAINT

424.    Furthermore, Defendant CDE denies female athletes equal access to sex-segregated facilities, such as locker rooms and bathrooms, by allowing biological males to use these spaces, thereby compromising the privacy, safety, and equitable use intended for female athletes under Title IX.

425.    This policy allows biological males to occupy roster spots on female teams, displacing biological females and reducing their overall participation rates.

426.    On June 25, 2025, the United States Department of Education Office of Civil Rights sent a Letter of Finding to Superintendent Tony Thurmond of the CDE, informing him that CDE's policies that allow boys to participate in girls' sports and to use girls' spaces "discriminate based on sex against girls in both its language and effect."[14]

427.    The letter went on to state, "Those [State] policies cause disparities of a substantial and unjustified nature in the benefits, treatment, services, and opportunities afforded to female athletes and have no meaningful impact on the benefits, treatment, services, and opportunities afforded to male athletes."[15]

428.    The competitiveness of girls' athletics in California is not equal to boys' athletics.

429.    As a result of Defendant CDE's enforcement of AB 1266, biological males were allowed to participate on the girls' cross-country team at Martin Luther King High School, displacing Plaintiffs T.S. and K.S., as well as other female cross-country athletes; biological males were allowed to participate on the girls' track and field team at Martin Luther King High School, displacing Plaintiff Save Girls' Sports members A.S., R.M., A.R., R.H., and O.V.; and the inclusion of a male athlete in a girls' volleyball program within a California school district led to the forfeiture of more than ten volleyball games.

430.    This as applied enforcement denies Plaintiffs equal athletic opportunities under Title IX, including fair competition, effective accommodation of interests and abilities, and equal

---

[14] U.S. Dep't of Educ., Office for Civil Rights, *Investigation Letter No. 10-256902-A* (June 25, 2025), https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/10256902-a.pdf?utm_ (last visited Oct. 24, 2025).

[15] *Id.*

1   treatment in athletic benefits. It creates unsafe and unfair environments and subordinates biological

2   females' rights to gender identity preferences.

3       431.    But for the California Department of Education's enforcement of AB 1266 (codified

4   as Cal. Educ. Code § 221.5(f)) – through issuance of guidance, FAQs, legal advisories directing

5   local educational agencies like the District to comply, and oversight of interscholastic athletic

6   policies – the District would not have implemented or continued the policy allowing biological

7   males on girls' athletic teams, and Plaintiffs would not have suffered the harms from the violations

8   of Title IX.

9       432.    As long as AB 1266 is in effect, Plaintiffs, including current members of Plaintiff

10  Save Girls' Sports and other female athletes, will continue to suffer harm by being subjected to girls'

11  sports programs and spaces that include boys.

12      433.    Defendant CDE, through oversight and enforcement, require District compliance,

13  frustrating Title IX's goal of equal participation opportunities. Plaintiffs T.S., K.S., and Save Girls'

14  Sports members suffer irreparable injury, including lost participation, emotional distress, and

15  diminished educational benefits, redressable by enjoining AB 1266's application and restoring

16  female-only teams.

17      434.    Accordingly, Plaintiffs are entitled to the relief requested herein.

18                          **PRAYER FOR RELIEF**

19      **WHEREFORE**, Plaintiffs pray for relief against Defendants as follows:

20      A.      That this Court issue a Declaratory Judgment, declaring Defendants' Speech Policy

21  prohibiting messages that are "likely to create a hostile or intimidating environment based upon any

22  protected class" on clothing unconstitutional, facially and as applied to K.S. and T.S. and SGS

23  members' speech;

24      B.      Injunctive relief enjoining Defendants, their officials, agents, employees, and all

25  persons in active concert or participation with them, from enforcing Defendants' Speech Policy

26  challenged herein both facially and as applied to the extent the Speech Policy prohibits K.S. and

27  T.S. and SGS members from wearing a shirt with the messages "Save Girls' Sports" and "It's

28  Common Sense. XX ≠ XY" or similar messages at MLKHS;

C.    That this Court issue a Declaratory Judgment, declaring that Defendants have violated Title IX by failing to provide equal treatment, benefits, and opportunities for girls in athletic competition;

D.    Injunctive relief enjoining Defendants, their officials, agents, and employees from enforcing and implementing AB 1266.

E.    An award of nominal, compensatory damages and other monetary relief as permitted by law;

F.    For costs, attorneys' fees and interest, as allowed by law; and

G.    For such other relief the Court determines is proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury.

DATED:  October 29, 2025                    ADVOCATES FOR FAITH & FREEDOM

By: /s/ Julianne Fleischer
    Julianne Fleischer, Esq.
    Attorney for Plaintiffs

1

**VERIFICATION**

2     I have read the foregoing **VERIFIED SECOND AMENDED COMPLAINT FOR**

3  **INJUNTIVE AND DECLARATORY RELIEF AND DAMAGES** and know its contents.

4     I am a party to this action.  The matters stated in the foregoing document are true of my own

5  knowledge except as to those matters which are stated on information and belief, and as to those

6  matters, I believe them to be true.

7     I declare under penalty of perjury under the laws of the State of California that the foregoing

8  is true and correct.

9     Executed on October 29, 2025, at Riverside, California.

10

11                                             _____
                                               T.S., a minor by and through her father and
12                                             natural guardian, RYAN STARLING

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I have read the foregoing **VERIFIED SECOND AMENDED COMPLAINT FOR INJUNTIVE AND DECLARATORY RELIEF AND DAMAGES** and know its contents.

I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 29, 2025, at Riverside, California.


_Cynthia Q Slavin_____
K.S., a minor by and through her mother and natural guardian, CYNTHIA SLAVIN


_____
K.S., a minor by and through her father and natural guardian, DANIEL SLAVIN

**VERIFICATION**

I have read the foregoing **VERIFIED SECOND AMENDED COMPLAINT FOR INJUNTIVE AND DECLARATORY RELIEF AND DAMAGES** and know its contents.

I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 29, 2025, at Riverside, California.

SAVE GIRLS' SPORTS, Ryan Starling

SAVE GIRLS' SPORTS, Daniel Slavin